**Robert Nathan GOLDSTEIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–89–01391–CR.**

Court of Appeals of Texas,
Dallas.

Jan. 11, 1991.

Rehearing Denied Feb. 19, 1991.

John Nation, John H. Hagler, Douglas D. Mulder, Gary A. Udashen and Kerry P. FitzGerald, Dallas, for appellant.

Kathi Alyce Drew, Dallas, for appellee.

Before WHITHAM, LAGARDE and KINKEADE, JJ.

## OPINION

WHITHAM, Justice.

Appellant appeals a conviction for securing execution of a document by deception. TEX.PENAL CODE ANN. § 32.46 (Vernon 1989). The jury assessed punishment at two years imprisonment, probated for two years. We find no merit in any of appellant's ten points of error. Accordingly, we affirm.

### Descriptive Background

Appellant, an assistant Dallas County District Attorney at the time of the offense, owned a condominium that incurred water damage. Appellant submitted a claim to his insurance company and the claim was settled. In settlement of the claim, the insurance company delivered to appellant a draft made payable to both Shenandoah Condominiums, of which appellant was president, and NorthPark Savings Association, from whom appellant had obtained his mortgage. Appellant took the draft to NorthPark Savings and secured NorthPark Savings' endorsement on the draft from a loan officer. The State subsequently alleged that appellant secured the execution of that endorsement by deception in that appellant told the loan officer that the repairs to the condominium had almost been completed. The State contended that the representation was false and that no repairs had been made. At trial, appellant testified that no false representations had been made and that the repair work had, in fact, commenced at that time. In light of three challenges to the sufficiency of the evidence, we quote the indictment:

Defendant, on or about the 4th day of November in the year of our Lord One Thousand Nine Hundred and Eighty-Eight, in the County and State aforesaid, did unlawfully, then and there, knowingly and intentionally, and with intent to defraud and harm NorthPark Savings Association, cause Anita J. Bontrager, acting in her capacity as Assistant Vice President of NorthPark Savings Association, to sign and execute a document affecting the pecuniary interest of NorthPark Savings Association, to-wit: an insurance draft, number 3722506398, dated November 3, 1988, in the amount of $4,995.00, and payable to the order of Shenandoah Condominium and North-Park Savings, by deception, to-wit: the said Defendant created and confirmed, by words and conduct, a false impression of fact, not believing it to be true, that was likely to and did affect the judgment of the said Anita J. Bontrager in the transaction, to-wit: that repairs to his condominium located at 3405 Shenandoah, University Park, Texas, had almost been completed; and the said Anita J. Bontrager, in reliance upon said false impression of fact, endorsed said draft on behalf of NorthPark Savings Association and released said draft to the said Defendant; ...

Moreover, in view of the nature of a number of appellant's points of error, you must know the provisions of two statutes creating criminal offenses. The first statute states that:

(a) A person commits an offense if, with intent to defraud or harm any person, he, by deception, causes another to sign or execute any document affecting property or service or the pecuniary interest of any person.

TEX.PENAL CODE ANN. § 32.46(a) (Vernon 1989). This offense is a felony. See TEX. PENAL CODE ANN. § 32.46(b) (Vernon 1989). The second statute provides that:

(b) A person commits an offense if, for the purpose of procuring money or any other thing of value in connection with the construction or repair:

(1) The person knowingly and with intent to defraud makes or causes to be made a false written statement to the effect that a bill, charge, account, or claim for labor performed or for material or specially fabricated material furnished for the construction or repair of a house, building, or improvement has been paid or satisfied in full or in part; and

(2) The person is:

(A) The owner of the real property or the owner's agent;

(B) An agent, director, officer, or employee of a corporation, firm, or association that is owner of the real property;

. . . .

\* \* \* \* \* \*

(c) An offense under Subsection (b) in a misdemeanor ...

TEX.PROP.CODE ANN. § 53.026 (Vernon 1984), *provisions repealed by amending* Act of May 26, 1989, 71st Leg., R.S., ch. 1138, § 3, 1989 TEX.GEN.LAWS 4694.

With this background, we preview certain of appellant's contentions. Appellant argues first that the conviction must be set aside because the doctrine of *in pari materia* was violated because the State prosecuted appellant under a general felony statute when a special misdemeanor statute was applicable. Appellant asserts that a penal provision contained in the Texas Property Code provided that a misdemeanor offense is committed when a person obtains money by making false representations that bills for repair to a residence had been paid. Hence, appellant insists that error was committed when appellant was prosecuted under a general statute rather than a special statute that specifically applied to the case. Second, appellant urges that the State failed to sustain its burden of proof since no showing was made that appellant caused the execution of the endorsement by "deception" or "with intent to defraud and harm" NorthPark Savings. Third, appellant maintains that the State failed to prove that the insurance draft was a "document affecting the pecuniary interest" of NorthPark Savings. Fourth, appellant argues that reversible error was committed when the trial court allowed the State to offer evidence of an extraneous offense concerning insurance fraud. Appellant tells us that such testimony was unrelated to the offense charged since the testimony concerned the alleged attempt by appellant to obtain an inflated bid for the repair work that would be submitted to the insurance company. Fifth, appellant would have us hold that other evidentiary errors occurred during the trial, including error when the trial court failed to grant a motion for new trial when testimony was presented that the jury received "other evidence" during the deliberations that was detrimental to appellant. With this descriptive background before us, we now provide a factual summary pertaining to the issues other than those concerning evidentiary rulings made by the trial court.

*Factual Summary*

On October 15, 1988, Steve Hunter, a service technician for General Home Repair, met appellant at a condominium located at 3405 Shenandoah in University Park, a suburb of Dallas, Texas. Appellant's condominium had sustained damage in several places—a leak in an upstairs bathroom caused water damage to hardwood floors, water stains on walls and ceilings, and damage to the sheetrock on the garage ceiling. Appellant also mentioned that, at a later time, he wanted Hunter to look at "some things on the exterior of the house." Appellant subsequently indicated some roof repairs. Appellant told Hunter that he had his own construction company; appellant stated that he intended that this company would do some of the work. Appellant asked, however, for a "total price" on the work and indicated that he wanted Hunter to prepare two bids, "one that would be his price and another bid that would be just the average customer's price." Hunter took this to mean a legitimate bid for the actual price and "one price would be what he would show somebody what he paid." Appellant told Hunter that he wanted to cover his $1,000.00 insurance deductible. Appellant and Hunter discussed some potential repairs to the outside of the condominium, specifically the need to repair, caulk, and paint around windows. Appellant also indicated that he thought some roof repairs were needed. Appellant told Hunter that he was the president of the homeowners association and that he would want all of that in another bid. Hunter said he would get back with appellant in a few days.

When Hunter returned to his office, he immediately wrote a report to his employ-

er, Kevin Byrd. In this report, Hunter indicated that he believed that his company should not do business with appellant. In Hunter's opinion, the request for two bids was not "the proper way to do business." Kevin Byrd, the president of General Home Repair, testified that he received a note from Hunter on October 17, 1988. Byrd first contacted a personal friend who was an attorney, and then called the Specialized Crime Division of the District Attorney's office. Byrd was concerned that, by being asked to produce two bids, his company could be vulnerable or perhaps liable for insurance fraud. Byrd agreed to cooperate with an investigation. As part of this investigation, Hunter and Byrd made several phone calls to appellant. These calls were tape recorded. A copy of this tape, with certain deletions, was introduced and admitted into evidence. Byrd arranged a meeting with appellant for October 18, 1988. Prior to that meeting, Byrd was outfitted with a wireless microphone by the District Attorney's Specialized Crime Division. Byrd then met with appellant at appellant's condominium; a recording of that conversation was introduced into evidence. During the course of this conversation, appellant told Byrd that he had water damage from two sources, the tub and the roof. Appellant also said that Byrd must be "interested in my peculiar approach to having this thing written up." Appellant explained that he worked his way through law school as a contractor for Big Tex Builders. Appellant then stated:

> What I want to do, and I don't think you have a problem with it, is, because, look, you know, I'm going to put a bunch of time in overseeing you guys coming in and out; I mean, it's gonna take me some time, too; so I want, I want to have an independent bid from y'all that would appear to be, you know, pretty high ... and get an actual price from y'all and y'all in that capacity would be the subcontractor of Big Tex and that way Big Tex can do the work and me and my partner, you know, could pay ourselves back for the time that I'm going to put into this thing....

Appellant emphasized that he needed a separate bid for the work to the outside of the building. When Byrd attempted to explain that insurance companies have set amounts that will be allowed for certain items, appellant replied, "I'm an attorney ... I make a good living off of fucking around with these insurance companies." Byrd indicated that the real cost of the work would be around $1,600.00. Appellant explained that he intended to get two or three other bids and then select Big Tex, whose bid would be "in the middle and around $4,500.00." He then said, "[t]hey're gonna turn around and give me $3,500.00, because I've got a $1,000.00 deductible, and I'm going to turn around and give you $1,600.00 and you can do the work." During the course of the conversation, appellant made some other remarks about insurance companies and about his desire to be paid for his time; these are as follows:

> [APPELLANT]: Let me be real honest with you—the insurance company wants to give you a bare bones settlement.
> BYRD: Uh-huh.
> [APPELLANT]: Secondly, they don't really want to pay for everything you're out. The truth of the matter is, I'm an attorney and I bill out at $150 an hour sometimes. Sometimes I bill out at $85, depending on what I can get. Old people, I charge them 85 bucks, or, you know—I'm a humanitarian too, but the truth is, I've got about six or seven hours of my time already invested in just talking to you guys.
> BYRD: Uh-huh.
> [APPELLANT]: I'm gonna have equal amount of inconvenience during the course of y'all doing all this shit. I'm looking at having twenty hours into this myself. Now, if I went to the insurance company, and I said, "Look, these guys are going to do all this work for $3,400, but I want y'all to give me $3,000 cause I've got twenty hours of my time in it," they're gonna laugh at me.
> [APPELLANT]: So, all I'm really doing is being the general contractor, and I don't think you can argue that there's anything wrong with that, because that's what you are, right?

In exchange for an inflated bid, appellant agreed, as president of the homeowners' association, to give Byrd the work on the outside of the condominium unit. In discussing his duties in this regard, appellant told Byrd as follows:

[APPELLANT]: It's a pain in the ass. But there's another thing. They don't pay me to work for them. I'll be goddamned if I'm gonna work for free. Shit, I'm a fucking lawyer. I want to be paid for my goddamn time. I don't go through all that shit—you know, you don't go to war and come back here and not want to be honored.

BYRD: Yeah, I hear ya.

[APPELLANT]: You don't go to law school and not want to get paid. (Laughs)

Appellant concluded by telling Byrd: "I like doing business with a young man. We're in the same boat. You—every, all the old people have all the money, we need to get some ourselves." Byrd identified State's Exhibit 3 as the bid for the interior repairs he gave appellant in the amount of $1,621.00 and State's Exhibit 4 as a bid for the outside work in the amount of $1,800.00 ($1,600.00 for painting and $200.00 to clean out gutters).

Following the October 18th meeting, Byrd made a series of phone calls to appellant. During one of these calls, appellant indicated that the homeowners' association would not give Byrd's company the job on the outside of the condominium since one of the members insisted on using another painter. During the final conversation on November 11, 1988, appellant indicated that the roof needed to be repaired before beginning the interior repairs. Byrd's company, General Home Repair, never did any repair work on appellant's condominium.

Bill Blackburn, the owner of B & C Builders and Siding Company, testified that he had made a bid for the job on appellant's condominium in October 1988. He testified that he knew appellant and that appellant had worked for him for six to eight months as a salesman bidding home improvement loans while attending Baylor Law School. Appellant told Blackburn that appellant needed the bids for insurance claims. Blackburn identified State's Exhibit 6 as the bid he left in appellant's mailbox. The total bid was for $5,231.00, with 25 to 30 percent figured as profit. Blackburn testified that appellant did not request an inflated bid. Blackburn indicated that appellant knew that he would not tolerate such a practice.

Russell Labhart, the production manager of the Stark Company, testified that he gave a bid to appellant for repair work on the condominium. The price quoted was $8,425.00. Labhart stated that he had no idea that these prices were to be given to an insurance company and, had he known that, he would not have given appellant a price at all. Labhart admitted that his price was not a fair price and that he had purposely put it too high because he did not wish to work for appellant. When Labhart told appellant that he would formalize the bid at his office and get it back to appellant in a couple of days, appellant demanded a bid immediately. Not wanting to give his company a bad name, Labhart complied with appellant's demands writing his bid on a yellow pad. Labhart then handed the bid to appellant who looked at it over and said, "That's more like it."

Bill Crouch, a property claims specialist for Crum and Forster Insurance Company, testified that he was assigned to a claim on appellant's condominium. The company was advised of a claim for property loss regarding a water leak on September 21, 1988. Appellant's insurance carried a $1,000.00 deductible and was written in the name of Shenandoah Condominium Association. Appellant's policy also carried a "standard mortgage clause" which listed North Park Savings as a party having an interest in the property. Crouch testified that the insurance company would normally place the name of the bank as a payee on any drafts that were issued to protect the bank's interest. Crouch met appellant at the condominium on October 3, 1988, to "see that type of damage he had and the degree of damages and to proceed with the adjustment of the claim." At this meeting, appellant attributed the damage to a

"plumbing leak in the wall in his bathroom on the second floor." Some displacement of shingles on the roof was also discussed. Crouch estimated the damage, based on his review and appellant's representations, at $4,960.80. Crouch again met with appellant on November 1, 1988, around 5:00 p.m. They discussed three estimates that appellant had brought, the bid from Stark in the amount of $8,425.00, one from Marble Delta Company for $5,995.00, and one from B & C for $5,231.00. They resolved the claim on the middle estimate for $5,995.00. Accounting for appellant's $1,000.00 deductible, the insurance company agreed to pay appellant $4,995.00. Payment was made on November 3, 1988. A photostatic copy of this draft issued to Shenandoah Condominiums and NorthPark Savings was admitted as State's Exhibit 14. State's Exhibit 15 shows the endorsement of both payees on the back of the check.

On November 4, 1988, Julie Slover, an employee of NorthPark Savings received a phone call from appellant asking what appellant should do about an insurance check appellant had received made out to both him and to the bank. Slover told appellant that this was normal procedure, that he should come to the bank, and "an officer would have him sign an affidavit of loss and then they would endorse the check over to him." Appellant told Slover that he would be right over "because he wanted to hurry up and cash the check before they put a stop payment on it." As it was past her lunch time, Slover left appellant's file with her supervisor, Anita Bontrager.

Ms. Anita Bontrager, the assistant vice president and manager of NorthPark Savings, confirmed that appellant had a mortgage with the bank at the time in question. Bontrager met with appellant on November 4, 1988, at the bank's location at 281 West Campbell Road in Richardson, Texas. Appellant had an insurance draft, payable to both himself and the bank, to be endorsed. Bontrager identified State's Exhibit 14 as the front of the draft and State's Exhibit 15 as the back of the draft. Bontrager filled out an affidavit of loss, for appellant's signature. In the process of completing the affidavit, it became essential to establish whether the repairs had been completed. In this regard, the following exchange occurred:

A. [BY MS. BONTRAGER] I was in the process of typing this and I said, "Have the repairs been completed?" [Appellant] said, "Yes." So I put an "X" in the box that says all the repairs have been completed and the bills will be paid from the proceeds.

[PROSECUTOR]: Did [appellant] equivocate in any way when he told you that?

[BONTRAGER]: Not at all.

[PROSECUTOR]: Then what happened?

[BONTRAGER]: I completed typing it. Since the amount of the draft was less than the amount required to do an inspection—

[PROSECUTOR]: How much is that?

[BONTRAGER]: $5,000.

—I marked an "X" in the box that says inspection not required.

[PROSECUTOR]: Then what happened?

[BONTRAGER]: I took the affidavit out of the typewriter, handed it to [appellant], and said that his signature is certifying that the repairs have been completed.

[PROSECUTOR]: What occurred?

[BONTRAGER]: As [appellant] was signing it he said, "Well, they're almost finished but not quite."

[PROSECUTOR]: All right. What occurred after that?

[BONTRAGER]: I endorsed the draft, asked for his driver's license, and notarized the affidavit.

[PROSECUTOR]: When [appellant] said, "Well, they aren't quite finished but will be," were those his words?

[BONTRAGER]: To the best of my knowledge and recollection.

[PROSECUTOR]: Did [appellant] say anything else about the work which had or had not been completed?

[BONTRAGER]: No.

[PROSECUTOR]: Did [appellant] indicate to you in any way how long it would be before the repairs would be completed?

[BONTRAGER]: Well, at the time it was such a short period of time I thought they would be finished by that afternoon or the next day.

That was the way that it was implied to me was that it was just a short period of time before everything would be finished.

[PROSECUTOR]: Do you remember the exact words that [appellant] used?

[BONTRAGER]: I don't recall the exact words but it was something to the effect they're not quite finished but almost.

Bontrager thereafter endorsed the check in her capacity as assistant vice-president of NorthPark Savings. Bontrager testified that the check was made payable to the bank "in order to protect our interests." Bontrager made it clear that "all insurance drafts are made payable to the insured and to the lienholder so that if damage occurs and it's just made payable to the insured that they can't take the money and not ever make the repairs because that would decrease the value of what we have an interest in as being lienholder." Bontrager emphasized that she believed that appellant had "already had the repairs completed and had already paid for them and this was reimbursing appellant for those repairs." Bontrager testified that she would not have signed the check and released it to appellant if she had known that "none of the repair work on the interior of the condominium had been started, much less completed." Had that been the case, Bontrager stated that she would have endorsed the check for the bank and deposited the draft in an escrow account rather than releasing the check to appellant. The utilization of an escrow account would have allowed her to "make sure that those repairs had been completed so that the value of the property would not be decreased and that the contractor would be paid for those repairs that were done." Since the amount in question was under $5,000.00, Bontrager had a certain amount of discretion as an officer of the bank. Bontrager stated that she did not ask for receipts from appellant because she believed and trusted him. Appellant had been a good customer and his payment history was current. The check was imme-diately deposited in appellant's personal bank account at Turtle Creek National Bank.

On November 15, 1988, Investigator J.M. Gholston served a search warrant on appellant at his residence. The purpose was to photograph the interior of the residence. These photographs were introduced as State's Exhibit 18 through 31. The photographic exhibits showed the following:

| | |
|---|---|
| State's Exhibit 18 | water streaks in living room |
| State's Exhibit 19 | water streaks in living room |
| State's Exhibit 20 | water damage in upstairs bathroom |
| State's Exhibit 21 | water damage in upstairs bathroom |
| State's Exhibit 22 | tub surrounding in upstairs bathroom (what would have to be demolished to repair leak) |
| State's Exhibit 23 | flooring in downstairs bathroom to be repaired |
| State's Exhibit 24 | flooring in downstairs bathroom to be repaired |
| State's Exhibit 25 | water damage in garage |
| State's Exhibit 26 | water damage in garage |
| State's Exhibit 27 | water damage in garage |
| State's Exhibit 28 | mildew stain on garage ceiling |
| State's Exhibit 29 | mildew stain on garage ceiling |
| State's Exhibit 30 | flooring in downstairs to be repaired |
| State's Exhibit 31 | wallpaper to be replaced in bathroom |

These photographs were identified by Byrd and depicted as the damage he had observed and bid on during his October visit to appellant's condominium. Byrd testified that between October 18 and November 15, 1988, no work had been done to the damage on appellant's condominium.

Testifying in his own behalf, appellant admitted that he had gone to the bank and that he met with Bontrager. Appellant claimed, however, that Bontrager never asked him whether all the repairs had been made prior to his signing the affidavit of loss. Appellant claimed that Bontrager questioned him after he had signed the affidavit. Appellant said that he, "made it clear to [Bontrager] that the work hadn't been completed." Appellant stated that it was never his intention to defraud and harm NorthPark Savings. Appellant later claimed that he had not read the affidavit of loss and was negligent in signing it. Appellant reiterated on cross-examination that he never misrepresented the state of the repairs to Bontrager. Appellant denied that he ever told Julie Slover that he want-

ed to cash the check before payment was stopped. Appellant stated that he wanted the insurance company to give him a "fair bid" so that he could have the work done and be out nothing other than his deductible. Appellant denied asking to be reimbursed for his time. Appellant claimed that the money was intended to be used to do the work and was used to do the work on appellant's condominium. Appellant admitted that he deposited the check into his bank at Turtle Creek National Bank on November 4, 1988. Appellant testified that it was important to deposit the check on that day so work could get started. He testified that the funds were expended on repairs that happened within the "next several weeks." Appellant then identified State's Exhibits 48–A, 48–B and 48–C as three pages of a bank statement dated November 7, 1988. State's Exhibit 49 was identified as a copy of a check written to American Express (hereinafter referred to as AMEX) for $6,507.15, dated November 1, 1988. As of November 3, 1988, however, appellant had a bank balance of $3,780.25. The November 4, 1988 deposit of the insurance check gave appellant a balance of $9,185.25. On November 7, 1988, after the AMEX check cleared, appellant's bank balance was $2,678.10. Appellant testified that the ultimate cost of the repairs was between approximately $7,300.00–$7,800.00. A real estate agent testifying for the defense stated that the improvements appellant made to the condominium had increased its value.

### The Doctrine of In Pari Materia

In his first point of error, appellant contends that the conviction must be set aside because the doctrine of *in pari materia* was violated. Appellant grounds his contention on the fact that the State prosecuted him under a general statute, section 32.46 of the Texas Penal Code, instead of a applicable special statute, former section 53.026(b) of the Texas Property Code. TEX.PENAL CODE ANN. § 32.46 (Vernon 1989); TEX.PROP.CODE ANN. § 53.026(b) *repealed by* Act of May 26, 1989, 71st Leg.R.S. ch. 1138, § 3, 1989 TEX.GEN.LAWS 4694. The rule of *in pari materia* is noth-

ing more than a principle of statutory interpretation, a means of devining and giving full effect to legislative intent. *Mills v. State*, 722 S.W.2d 411, 413 (Tex.Crim.App. 1986). Two statutes that are *in pari materia* are to be construed together, each enactment in reference to the other, as though they were part of one and the same law. Any conflict between their provisions will be harmonized, if possible, and effect will be given to all the provisions of each act if they can be made to stand together and have concurrent efficacy. *Mills*, 722 S.W.2d at 413. Statutes may be said to be *in pari materia* when they relate to the same person or things, to the same class of persons or things, or have the same purpose or object. *Mills*, 722 S.W.2d at 413. Characterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other. *Mills*, 722 S.W.2d at 413.

It is just as clear that if two statutes do not deal with the same subject matter, persons or purpose, they are not *in pari materia* and should each be construed separately and in accordance with the plain wording of the particular statute. *Cheney v. State*, 755 S.W.2d 123, 127 (Tex.Crim. App.1988). It follows that before the rule is applied, a threshold determination must be made whether the two statutes in question are indeed *in pari materia. Cheney*, 755 S.W.2d at 127. As a starting point then, the two statutes should be viewed and a determination made whether both provisions cover the same general subject matter or persons, or have so similar a purpose or object that the statutes are indeed *in pari materia. Cheney*, 755 S.W.2d at 127.

We conclude that the two statutes do not cover the same general subject matter or person, or have similar purpose or object. Hence, we determine the answer to the threshold question to be that the two statutes in question are not in *pari materia*. In reaching this conclusion we focus on the most important characterization of object or purpose. *See Mills*, 722 S.W.2d

at 413. Under section 32.46, the "forbidden conduct" is *deception*. *Mills*, 722 S.W.2d at 415. The conduct must be perpetrated with the specific intent to defraud or harm any person and must cause another to sign or execute any document. *Mills*, 722 S.W.2d at 415–16. Thus, when the result of the conduct, *i.e.*, the signing of the document, is one affecting property or service or the pecuniary interest of any person, the offense is complete. *Mills*, 722 S.W.2d at 416. In the present case, we conclude that the draft constituted a "document" within the meaning of section 32.-46. Because the draft affected NorthPark Savings' security interest in the condominium, we conclude that the draft affected the pecuniary interest of NorthPark Savings. Thus, one object or purpose of section 32.46 is to prohibit deceiving a person into signing a document affecting that person's pecuniary interests. On the other hand, the "forbidden conduct" under former section 53.026(b) of the Property Code is the making or causing to be made a *false written statement*. The statement must be made with (1) intent to defraud and (2) must state in effect that a debt for the construction or repair of a house, building or improvement has been paid or satisfied in full or in part. Thus, the offense is complete when the written false statement relating to repairs is made. We conclude, therefore, that the statutes do not have the same general purpose. The purpose of former section 53.026(b) is to prevent owners of real property from making false writings which might prevent contractors, subcontractors, or materialmen from being paid. The purpose of section 32.46 is to prosecute individuals who secure the execution of a document by deception. Appellant was prosecuted for his deceptive statements which induced a bank officer to endorse an insurance draft to him and the effect of that deception on the interest of NorthPark Savings. The execution of the affidavit of loss was evidentiary of that deception; it was not, however, the object of the prosecution. *See Willbur v. State*, 729 S.W.2d 359, 361 (Tex.App.—Beaumont 1987, no pet.) (holding that section 32.46 and section 37.02 of the Penal Code, the

misdemeanor perjury statute, are not *in pari materia*). We conclude that in the present case it is not the making of the affidavit of loss, but rather the endorsement on the insurance draft which is central to prosecution. Indeed, the endorsement of the draft by appellant is not a "false written statement." Thus, we conclude that former section 53.026(b), which relates to a different purpose and different things, is inapplicable. We reach this conclusion because the purpose of former section 53.026(b) is to discourage false written statements pertaining to real estate improvements or repair that might result in loss to providers of labor and material. Section 32.46, on the other hand, has the purpose of discouraging loss that might result to a party signing a document brought on by deception. As to former section 53.026(b), the victim to be protected is a third party. As to section 32.46, the victim to be protected is the party with whom the accused deals directly, *i.e.*, the person deceived.

██ For the above reasons, we conclude that the two statutes are not *in pari materia*. We reach this conclusion because as discussed above, the two statutes do not cover the same general subject matter or persons, or have similar purposes or objectives. *See Cheney*, 755 S.W.2d at 127; *Mills*, 722 S.W.2d at 415. Nevertheless, the conclusion that the two statutes are not *in pari materia* is not the end of the inquiry. If the two statutes are not found to be *in pari materia*, analysis should still focus on whether the statutes may be harmonized or are in irreconcilable conflict with one another. *Cheney*, 755 S.W.2d at 127. Where two provisions not *in pari materia* are at issue, other rules of statutory construction will then dictate which statute controls. As directed in *Cheney*, we now focus specifically upon whether the two statutes may be harmonized and determined not to be in irreconcilable conflict with one another. To this end, we repeat what we have said in determining that the two statutes are not *in pari materia*. One statute protects third parties from the accused. The second statute protects the

person with whom the accused transacts business. Hence, we conclude that there is no irreconcilable conflict between the two statutes and that our recognition of the different type parties protected harmonizes the two statutes. Because NorthPark Savings was a protected party under Penal Code section 32.46, we conclude that the State properly prosecuted appellant under section 32.46. We express no opinion as to whether, under other or additional facts, appellant might be prosecuted under former section 53.026(b) of the Property Code. We conclude, therefore, that we need not set aside appellant's conviction because the doctrine of *in pari materia* was violated. We conclude further, therefore, that we need not set aside appellant's conviction because the State prosecuted appellant under a general statute when a special statute was applicable. We overrule appellant's first point of error.

### *Appellant's Three Challenges to The Sufficiency of the Evidence To Support the Conviction*

■■■ This is a circumstantial evidence case. It is not required that the circumstances should to a moral certainty actually exclude every hypothesis:

(1) that appellant did not cause the insurance draft to be endorsed by the use of deception (appellant's second point of error below),

(2) that appellant did not act with intent to defraud and harm NorthPark Savings (appellant's third point of error below), and

(3) that the insurance draft was not a document affecting the pecuniary interest of NorthPark Savings (appellant's fourth point of error below);

but that the hypothesis intended is a reasonable one consistent with the facts proved and the circumstances, and the suppositions:

(1) that appellant caused the insurance draft to be endorsed by the use of deception,

(2) that appellant acted with intent to defraud and harm NorthPark Savings

(appellant's third point of error below), and

(3) that the insurance draft was a document affecting the pecuniary interest of NorthPark Savings;

must not be out of harmony with the evidence. *See Vaughn v. State,* 607 S.W.2d 914, 921 (Tex.Crim.App. [Panel Op.] 1980). The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases; and that is to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Garrett v. State,* 682 S.W.2d 301, 304 (Tex.Crim. App.1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). For the reasons that follow, we conclude that the evidence is sufficient to support the conviction.

■■■ In his second point of error, appellant contends that the evidence is insufficient to support the conviction since the State failed to show that appellant caused the insurance draft to be endorsed by the use of "deception." Section 32.46 of the Penal Code fails to define "deception." Appellant likewise fails. Nevertheless, we look to the definition of deception contained in another section of the Texas Penal Code as suggested by the Practice Commentary under section 32.46:

"Deception" means creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true.

TEX.PENAL CODE ANN. § 31.01(2)(A) (Vernon 1989). We begin by noting that the testimony of appellant contradicts that of Bontrager. Contradictions in witnesses' testimony does not destroy the sufficiency of the evidence. *See Weisinger v. State,* 775 S.W.2d 424, 429 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd). Moreover, the trier of fact is the sole judge of the weight and credibility of the witnesses and may believe or disbelieve all or any part of any witness' testimony. *Williams v. State,* 692 S.W.2d

671, 676 (Tex.Crim.App.1984). In the present case, the jury believed Bontrager and not appellant. Furthermore, the State introduced fourteen photographs of the interior of appellant's condominium. These photographs were taken on November 15, 1988, eleven days after appellant's visit to Bontrager. The jury was free to view the photographs to show that no work had been done on the interior of appellant's condominium. Indeed, on cross-examination, the jury heard appellant admit that none of the interior work had been performed as of November 4, 1988. Under appellant's second point of error, the pertinent question on appeal is whether any rational trier of fact, viewing the evidence in the light most favorable to the verdict, could have found beyond a reasonable doubt that appellant caused the insurance draft to be endorsed by NorthPark Savings by the use of deception. We conclude that in the present case any rational trier of fact could have found that appellant created and confirmed by words and conduct a false impression of fact, not believing it to be true, that affected the judgment of Bontrager. We reason that the cumulative force of all the incriminating circumstances was sufficient for the jury, as the trier of fact, to decide, as it did, that appellant, was beyond a reasonable doubt, guilty of "deception" as that word is used in section 32.46. We conclude, therefore, that the State did not fail to show that appellant caused the insurance draft to be endorsed by the use of "deception." We overrule appellant's second point of error.

 In his third point of error, appellant contends that the evidence is insufficient to support the conviction since the State failed to prove that appellant acted "with the intent to defraud and harm" Northpark Savings. Intent can be inferred from the acts, words and conduct of the accused. *Romo v. State*, 593 S.W.2d 690, 693 (Tex.Crim.App. [Panel Op.] 1980). Moreover, "intent to defraud and harm" as used in section 32.46 is a question of fact to be determined from all the facts and circumstances. *See Willbur*, 729 S.W.2d at 361. Under appellant's third point of error, the pertinent question on appeal is whether

any rational trier of fact, viewing the evidence in the light most favorable to the verdict, could have found beyond a reasonable doubt that appellant intended to defraud and harm NorthPark Savings. In the present case, the jury could determine that appellant signed the affidavit of loss knowing the repairs had not been completed and that NorthPark Savings had a financial interest in the repair of the mortgaged condominium. We conclude, therefore, that in the present case any rational trier of fact could have found that appellant intended to defraud and harm NorthPark Savings. We reason that the cumulative force of all the incriminating circumstances was sufficient for the jury, as the trier of fact, to decide as they did, that appellant acted beyond a reasonable doubt with the intent to defraud and harm NorthPark Savings. *See Vaughn*, 607 S.W.2d at 921. We conclude, therefore, that the State did not fail to prove that appellant acted with the intent to defraud and harm NorthPark Savings. We overrule appellant's third point of error.

 In his fourth point of error, appellant contends that the evidence is insufficient to support the conviction since the State failed to prove that the insurance draft was a "document affecting the pecuniary interest" of NorthPark Savings. The term "pecuniary interest" is not defined under section 32.46. It is, therefore, to be given its plain and ordinary meaning. *Floyd v. State*, 575 S.W.2d 21, 23 (Tex. Crim.App. [Panel Op.] 1978), *appeal dism'd*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). "Pecuniary" can be defined as "[m]onetary; relating to money; financial; consisting of money or that which can be valued in money." BLACK'S LAW DICTIONARY 1018 (5th Ed.1979), *see also El Paso Electric Ry Co. v. Benjamin*, 202 S.W. 996, 998 (Tex.Civ.App.—El Paso 1918, writ dism'd). The word "pecuniary" is often considered a synonym of the word "financial." ROGET'S INTERNATIONAL THESAURUS 835.30 (4th Ed.1979). The question to be resolved is whether NorthPark Savings had a financial stake in the condominium. Under appellant's fourth point of er-

ror, the pertinent question on appeal is whether any rational trier of fact, viewing the evidence in the light most favorable to the verdict, could have found beyond a reasonable doubt that the insurance draft was a document affecting the pecuniary interest of NorthPark Savings. The jury heard evidence that NorthPark Savings was the mortgagee on appellant's condominium, that property damage insurance drafts are made payable to the lienholder to help insure that repairs are completed when mortgaged property suffers damage and that if repairs are not made, the value of the mortgaged property decreases. Consequently, we conclude that in the present case any rational trier of fact could have found that the insurance draft was a document affecting the pecuniary interest of NorthPark Savings. We reason that the cumulative force of all the incriminating circumstances was sufficient for the jury, as the trier of fact, to decide, as they did, that the insurance draft was beyond a reasonable doubt a document affecting the pecuniary interest of NorthPark Savings. We conclude, therefore, that the State did not fail to prove that the insurance draft was a document affecting the pecuniary interest of NorthPark Savings. We overrule appellant's fourth point of error.

### Appellant's Challenges to Various Trial Court Rulings

In his fifth point of error, appellant contends that the trial court erred in admitting testimony that the appellant had attempted to commit an extraneous offense involving insurance fraud. For the purposes of this opinion, we do not reach the question of whether an "offense" is involved or whether a "transaction" is involved. The standard for admissibility is the same. *See Plante v. State*, 692 S.W.2d 487, 490 n. 3 (Tex.Crim.App.1985). Since appellant refers to "extraneous offense," we use that terminology. The gravamen of appellant's fifth point of error is the taped conversations between appellant and Kevin Byrd. Appellant argues that there is no connection between the offense of attempted insurance fraud and the charge of securing

execution of a document by deception. We disagree.

The test of admissibility has two steps. First, it must be determined that the extraneous offense evidence is relevant to a material issue in the case other than the defendant's character. Second, the evidence must possess probative value which outweighs its inflammatory or prejudicial effect. *Plante*, 692 S.W.2d at 491. As to relevancy, it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable. *See Plante*, 692 S.W.2d at 491. Where the material issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extraneous offense derives purely from the point of view of the doctrine of chances. In short, there must be a similarity in the various instances in order to give them probative value. *See Plante*, 692 S.W.2d at 491–92. Thus, to answer the first inquiry as to relevancy, we look for similarity in the insurance fraud and the securing of NorthPark Savings' endorsement of the insurance draft. We conclude that we need not look far. Both actions on appellant's part have one common thread; *i.e.*, to put cash in appellant's pocket in the amount of his insurance deductible on his claim following damage to his residence. We call to mind appellant's remark to Slover that he wanted to deposit the insurance draft in his bank account before the insurance company stopped payment. Hence, we conclude that the extraneous offense evidence is relevant to a material issue in the case—appellant's intent to defraud and harm NorthPark Savings. We turn then to consider the second test of admissibility. Where intent or guilty knowledge is an essential element of the offense which the State must prove to obtain a conviction, its materiality goes without saying. *Cantrell v. State*, 731 S.W.2d 84, 89 (Tex.Crim.App. 1987). Nevertheless, evidence of an extraneous offense is inherently prejudicial. *See Elkins v. State*, 647 S.W.2d 663, 665 (Tex.Crim.App.1983). However, the prejudice inherent in the admission of an extraneous offense can be lessened in several ways. *Robinson v. State*, 701 S.W.2d 895,

899 (Tex.Crim.App.1985). A proper instruction on the limited use of an extraneous offense will lessen the prejudice. *Robinson*, 701 S.W.2d at 899. In the present case, the trial court submitted an instruction limiting the jury's consideration of extraneous offenses to the issue of intent. Also, the State's witness, insurance adjuster Crouch, testified that appellant's claim was resolved fairly. Further, the extraneous offense was not introduced as a criminal offense. *See Robinson*, 701 S.W.2d at 899. Consequently, we conclude that the evidence of the extraneous offense possesses probative value which outweighs its inflammatory or prejudicial effect. Hence, we conclude further that the two tests of admissibility are met and that, therefore, the trial court did not err in admitting testimony that appellant had attempted to commit an extraneous offense involving insurance fraud. We overrule appellant's fifth point of error.

 In his sixth point of error, appellant contends that the trial court erred in admitting evidence of an extraneous transaction in which appellant used proceeds from his checking account to pay an American Express bill. The record reflects a deposit on November 4, 1988, of the $4,995.00 insurance draft to appellant's personal checking account. The previous day, his balance had been $3,780.25; the deposit increased the daily account to $9,185.25. State's Exhibit 49 was identified as the AMEX check for $6,507.15. The AMEX check, dated November 1, 1988, cleared the bank on November 7, 1988. Appellant's balance after that was $2,678.10. Nevertheless, appellant maintains that admission of the evidence concerning payment of the AMEX bill with the funds obtained from the insurance draft constitutes improper admission of an extraneous offense. We disagree. We conclude that the evidence was properly admitted to prove appellant's intent to defraud and harm NorthPark Savings. For the reasons disposing of appellant's fifth point of error, we overrule appellant's sixth point of error.

 In his seventh point of error, appellant contends that the State was im-properly allowed to impeach appellant on a collateral issue. Testifying in his own behalf, appellant admitted that he was a graduate of Baylor Law School and a licensed attorney. On April 11, 1988, appellant was employed as a misdemeanor prosecutor by the Dallas County District Attorney's Office. That employment was terminated on November 15, 1988. On cross-examination, appellant revealed that, while a prosecutor, he had established a legal business on the side. Appellant testified that he had done so with the permission of his supervisor, Kim Gilles. As appellant explained, "moonlighting and wanting to provide a nice life for your wife and family isn't a crime." The State informed appellant that the prosecutor intended to call Gilles as a witness. Prior to Gilles' testimony, appellant objected on grounds that the State was attempting to impeach him on a collateral matter. At a hearing outside the presence of the jury, the prosecutor made a "proffer of proof," stating that he expected Gilles to testify that she never gave appellant permission to "have an outside law practice." The prosecutor stated that he wished to offer the evidence to challenge on the basis of appellant's credibility in order to prove that appellant's testimony that he had Gilles' permission was an absolute falsehood. The trial court overruled appellant's objection. The defense rested and the State proceeded in rebuttal. Gilles testified that she was appellant's supervisor in the misdemeanor division. Gilles testified that appellant had never asked her permission to have an outside practice of law. Gilles also testified that she had never given appellant permission to carry on an outside practice of law while he was employed as an assistant district attorney. Indeed, Gilles testified that it was the policy of the District Attorney's office to forbid the establishment of an outside legal practice. When a witness is cross-examined on a collateral matter, the cross-examining party cannot then contradict the witness. *Bates v. State*, 587 S.W.2d 121, 133 (Tex.Crim.App.1979). The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case

tending to establish his plea. *Bates,* 587 S.W.2d at 133. We conclude that whether or not appellant was permitted to engage in private law practice while an assistant district attorney was not independently provable by the State as a part of the State's case in chief. Hence, we conclude the matter at issue is collateral. We reach this conclusion because appellant's availability to represent private clients was in no way relevant to any contested or material issue in the case. Hence, the State should not have been allowed to contradict appellant on the matter of appellant's availability to represent private clients. We conclude, therefore, that the trial court erred in allowing Gilles' testimony impeaching appellant on a collateral issue.

■■■ Having found trial court error, we reach the question of whether that error constituted harmful error requiring reversal. TEX.R.APP.P. 81(b)(2). We note, however, that as a reviewing court, we should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making. *Harris v. State,* 790 S.W.2d at 587–88. Thus, Rule 81(b)(2) mandates that the appellate court focus upon the error and determine whether it contributed to the conviction or the punishment. *Harris,* 790 S.W.2d at 585. With these instructions before us, we consider appellant's argument made to focus upon the error and the determination of whether it contributed to the conviction. We quote appellant's argument in full:

> This error was not harmless beyond a reasonable doubt within the meaning of Rule 81(b)(2). Indeed, this evidence introduced a new and harmful fact against appellant—that he was guilty of conduct unbecoming an Assistant District Attorney. Through this testimony, the State elicited from appellant's supervisor that he was guilty of contravening official department policy. It simply cannot be said that this generalized evidence of appellant's bad character made no contribution to either the verdict or the punishment assessed.

We disagree. Indeed, we conclude that "this generalized evidence of appellant's bad character made no contribution to" the verdict. We reach this conclusion because the State's case-in-chief alone could lead the jury to believe "that [appellant] was guilty of conduct unbecoming an Assistant District Attorney." We reason that, although the jury heard through Gilles that appellant, in appellant's words, "was guilty of contravening official department policy," that improperly admitted bit of evidence would not lead the jury to convict. We fail to see how declaring harmless the admission of Gilles' testimony would encourage the State to repeat the error with impunity. *See Harris,* 790 S.W.2d at 587. Indeed, knowing what the jury heard about appellant before jury deliberations, we fail to see that the jury would put much weight upon Gilles' testimony. *See Harris,* 790 S.W.2d at 587. In this connection, we point out that appellant does not complain of Gilles' testimony as allowed evidence of an extraneous offense or transaction. For the above reasons, we conclude that the error was harmless beyond a reasonable doubt within the meaning of Rule 81(b)(2). We overrule appellant's seventh point of error.

■■■ In his eighth point of error, appellant contends that reversible error was committed when the trial court refused to allow all of the testimony to be read to the jury regarding a particular point in dispute. During the deliberations at the guilt-innocence phase of the trial the jury sent the following note to the trial court:

> The jury has disagreed on the part of the testimony of Bill Blackburn. We are in dispute as to whether he was awarded the work on Mr. Goldstein's condo. We are also in dispute regarding when Bill Blackburn was awarded the job.

The trial court then had the court reporter read to the attorneys that portion of the testimony that was going to be read to the jury. The defense then objected that the testimony to be read to the jury was incomplete and failed to place the testimony in the proper context since it did not include a portion of the cross-examination of such witness by the defense. The defense then offered the applicable portion of the cross-

examination of the witness Blackburn. The request was denied by the trial court. The court reporter then read only a portion of the witness Blackburn's testimony concerning the awarding of the contract. The record does not tell us what testimony was read back to the jury. The portion of Blackburn's testimony that the trial court refused to have read to the jury was, as follows:

Q. Did he appear to be interested in having work done as soon as he could get it done? Did he want it done right away?

A. Well, he did make this comment and I don't remember when he made the comment to me but I remember telling him that if I got the bid that it would be from three to four weeks before I could ever start the job.

Q. Did he appear to be anxious to get the work done? Did he want it done yesterday?

A. Yes, sir. Well, everybody does when they get a bid they want it done yesterday.

Q. He was consistent with that position, he wanted it done yesterday?

A. Yes, sir.

Appellant argues that reversible error was committed when the trial court refused to allow the foregoing cross-examination of the witness Blackburn to be read to the jury. Appellant insists that the excluded testimony clearly bore on the disputed point and would have assisted the jury in resolving such dispute.

The Texas Code of Criminal Procedure, provides:

In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other; but if there be no such reporter, or if his notes cannot be read to the jury, the court may cause such witness to be again brought upon the stand the judge shall direct him to repeat his testimony as to the point in

dispute, and no other, as nearly as he can in the language used on the trial.

Tex.Code Crim.Proc.Ann. art. 36.28 (Vernon 1981). When the jury asks that certain disputed testimony be re-read, the court must first determine if the request is proper under article 36.28. If it is proper, the court must then interpret the communication; decide, in its discretion what sections of the testimony will best answer the query, and limit the testimony accordingly. *Iness v. State*, 606 S.W.2d 306, 314 (Tex. Crim.App.1980). The jury's request sought two answers from Blackburn's testimony: first, whether Blackburn was awarded the work; and second, if awarded the work, when. Hence, the jury wanted to resolve a dispute as to "if" and "when." We conclude that the denied reading of Blackburn's testimony arguably could bear upon the "when" dispute. However, we fail to see how the denied Blackburn testimony could shed any light on whether Blackburn "was awarded the work." In any event, we conclude that the trial court did not abuse its discretion in refusing to allow reading of the denied Blackburn testimony. We reach this conclusion because we do not know what of Blackburn's testimony was read to the jury. Thus for all we know from this record, the jury was provided a reading of Blackburn's testimony that adequately addressed the jury disputes as to "if" and "when." Hence, we reason that we cannot find an abuse of discretion on the part of a trial court when we do not have a full record of how the trial court acted in the matter at issue. Therefore, we conclude that the trial court did not err in refusing to allow the reading of the requested Blackburn testimony. We overrule appellant's eighth point of error.

In his ninth point of error, appellant contends that the trial court erred in failing to grant the motion for new trial based on jury misconduct. Appellant filed a motion for new trial alleging jury misconduct as follows:

4.) Jury misconduct was committed during deliberations on guilt-innocence. The jury deliberated several hours before reaching a verdict. Mr. W. Don Roberts, whose vote was to acquit Defendant, was

induced to change his vote to guilty based upon the improper representations of other jurors that Defendant would be granted probation if convicted and would not lose his license to practice law.

The following constitutes all of the new trial hearing testimony of juror Roberts relied upon by appellant. Roberts was asked whether any comments were made during the deliberations at the guilt-innocence phase of the trial concerning whether appellant would lose his law license if convicted. Roberts responded:

I think the way that came down was that there was a statement made that if he were found guilty he probably would not serve any time in jail, and the second portion of it there was a response that he probably would even lose his license if he did.

And at that point it was kind of a discussion of—well, it wasn't clear whether he would or wouldn't, not anything in specific, but the discussion came up that he would lose his license if he were found guilty.

Defense counsel further questioned Roberts whether there was any discussion as to whether appellant would be granted probation if he were convicted:

[Roberts]: I don't specifically remember any that he would be granted probation. I think I probably inferred that he would not—I probably inferred that he would be probated.

Roberts further stated:

[Roberts]: I would say, you know, there's a lot—it's not a black and white case as far as what caused me to change my verdict from not guilty to guilty. There's a lot of different things that transpired, and I would say that the general attitude that I....

■■■■ Appellant asserts that Roberts' above testimony proves that the jury received "other evidence" requiring a new trial under and pursuant to Rule 30(b)(7) of the Texas Rules of Appellate Procedure. In this connection, appellant argues that the "other evidence" supplied concerned the fact: first, that appellant would not lose his law license if convicted; and second, that appellant would receive a probated sentence. The determination of whether a jury has "received" other evidence is a question of degree, and a passing remark will not constitute receipt of other evidence. *Baldonado v. State*, 745 S.W.2d 491, 495 (Tex.App.—Corpus Christi 1988, pet. ref'd). We read Roberts' testimony to constitute reference to "passing remarks." Hence, we cannot say that the trial court's implied finding to that effect constitutes an abuse of discretion. Indeed, issues of fact as to jury misconduct raised in a motion for new trial are for the determination of the trial court. *Baldonado*, 745 S.W.2d at 495. Certainly, it is not mandatory to grant a new trial every time a juror mentions something that is not supported by the evidence. *Baldonado*, 745 S.W.2d at 495. It follows that the trial court did not err in failing to grant the motion for new trial based on jury misconduct. We overrule appellant's ninth point of error.

■■■■ In his tenth point of error, appellant contends that the trial court erred in refusing to allow the defense attorney to question a juror during the motion for new trial hearing regarding the jury deliberations. Appellant complains that the trial court sustained the State's objections to the following six questions put to juror Roberts by defense counsel:

1. Did you change your vote based upon any representations by jurors that—as to punishment, what punishment would be assessed?

2. Mr. Roberts, would you state the facts with reference to any discussions which occurred about what sentence would be assessed if the defendant were convicted?

3. Did you change your vote in any manner based on representations by other jurors that Mr. Goldstein would not lose his law license if convicted?

4. Did those discussions, even if nothing definitive was reached, cause you to do anything?

5. Was your change based on the discussions we have just gone into?

6. Why did you change your vote?

Appellant also argues that the trial court erred in refusing to admit into evidence the following motion for new trial affidavit of Roberts:

During the guilt/innocence deliberation phase a comment was made by one of the jurors that Robert Goldstein probably would never go to prison nor even loose [sic] his license to practice law if we found him guilty. A discussion followed. As a result of the previous factors, which included the discussion about this being a probation case as well as him probably not loosing [sic] his license, I did change my verdict from not guilty to guilty with the presumption that he would receive no sentence greater than the minimum, with probation, from this jury.

This case has been a terribly taxing ordeal for me, and my family. It has caused me to compromise my principals [sic] of right and wrong in favor of legal technicalities—that I am not certain I interpreted correctly.

We emphasize that appellant's brief concedes that testimony was elicited form Roberts. Roberts was asked whether any comments were made during the deliberations at the guilt/innocence phase of the trial concerning whether appellant would lose his law license if convicted. Roberts responded:

I think the way that came down was that there was a statement made that if he were found guilty he probably would not serve any time in jail, and the second

### Question

1. Did you change your vote based upon any representations by jurors as to punishment?

2. State the facts with reference to discussions about what sentence would be assessed if the defendant were convicted.

portion of it there was a response that he probably would even lose his license if he did.

And at that point it was kind of a discussion of—well, it wasn't clear whether he would or wouldn't, not anything in specific, but the discussion came up that he could lose his license if he were found guilty.

The defense attorney further questioned Roberts whether there was any discussion as to whether appellant would be granted probation if he were convicted:

[Roberts]: I don't specifically remember any that he would be granted probation. I think I probably inferred that he would not—I probably inferred that he would be probated.

Roberts further stated:

I would say, you know, there's a lot—it's not a black and white case as far as what caused me to change my verdict from not guilty to guilty.

There's a lot of different things that transpired, and I would say that the general attitude that I—

The parties' brief appellant's tenth point of error as though its disposition turns upon construction of Rule 606(b) of the Texas Rules of Criminal Evidence. We reach application of the rule later. First, we consider the state of the record. We conclude that Roberts above quoted testimony provided adequate answer to the six questions at issue.

### Answer

[I]t's not a black and white case as far as what caused me to change my verdict from not guilty to guilty.

I think the way that came down was that there was a statement made that if he were found guilty he probably would not serve any time in jail, and the second portion of it there was a response that he probably would even lose his license if he did.

---

(In connection with the second question and answer, we remind you that the Roberts' motion for new trial affidavit put in issue whether appellant would "never go to pris-

on nor even loose [sic] his license to practice law." No where does the Roberts' affidavit raise the question of ;"what sentence would be assessed if the defendant were convicted.")

3. Did you change your vote in any manner based on representation of other jurors that appellant would not lose his law license if convicted?

[I]t's not a black and white case as far as what caused me to change my verdict from not guilty to guilty.

4. Did those discussions, even if nothing definitive was reached, cause you to do anything?

[See answer to questions one and three above. Thus, it is obvious Roberts, in effect, answered "yes." He changed his vote.]

5. Was your change based on the discussions we have just gone into?

[See all of above quoted Roberts' testimony. Hence, it is obvious Roberts, in effect, answered "yes." He changed his vote based on the discussions.]

6. Why did you change your vote?

[I]t's not a black and white case as far as what caused me to change my vote from not guilty to guilty.

---

For the purposes of this opinion, we assume, but do not decide, that the trial court erred in sustaining the State's objection to the six questions and to the affidavit. Given Roberts above quoted testimony, however, which appellant concedes is contained in the record, we fail to see how the error was harmful to appellant. Indeed, although appellant argues in his brief that these restrictions placed on the defense attorney while questioning Roberts constituted reversible error, appellant fails to construct for us an argument on which a conclusion of reversible error could be drawn. If we are to reach a conclusion of reversible error, then we must have reasoned argument on that issue in appellant's brief. Given Roberts' testimony in evidence, we conclude that beyond a reasonable doubt the assumed error made no contribution to the conviction or to the punishment. See TEX.R.APP.P. 81(b)(2).

■■■■ In the event we are wrong in our disposition of appellant's tenth point of error based upon assumed error determined not to be reversible error, we address the application of Rule 606(b). Under Rule 606(b) jurors remain incompetent to impeach their verdict by affidavit or testimony about their mental processes during deliberations except where relevant to an *overt act* of jury misconduct. *Hernandez v. State*, 774 S.W.2d 319, 325 (Tex. App.—Dallas 1989, pet. ref'd). In the present case, evidence of the overt acts and the content of those acts was in evidence; *i.e.*, discussions about appellant serving jail time and appellant losing his law license. Thus, we consider whether Roberts was competent to testify about his mental processes during deliberations. We read the thrust of the six questions and affidavit to be aimed at learning Roberts' mental processes; *i.e.*, why he changed his vote from not guilty to guilty. Indeed, the sixth question was "[w]hy did you change your vote?" Evidence of the mental processes of jurors is clearly inadmissible evidence. A juror cannot impeach his own verdict. *Hernandez*, 774 S.W.2d at 326. It follows, that under Rule 606(b) Roberts was incompetent to impeach his verdict. Therefore, the trial court did not err in refusing to allow the defense attorney to question a juror during the motion for new trial hearing regarding the jury deliberations. Moreover, for the same reasons, the trial court did not err in refusing to admit into evidence Robert's motion for new trial affidavit.

For all of the above reasons, we overrule appellant's tenth point of error.

Affirmed.