ELLISON, District Judge,
dissenting:
While I concur with much of the majority’s well-written opinion, I dissent on one critical issue. Specifically, I believe the record does not support the district court’s take-nothing judgment which was predicated on the theory that no reasonable jury could have concluded that the act of securing Escamilla’s release would have been a crime.

I. The Legal Standard for Judgment as a Matter of Law

This Court properly reviews de novo the district court’s ruling on a motion for judgment as a matter of law (“JMOL”), applying the same legal standard used by the district court. Coffel v. Stryker Corp., 284 F.3d 625, 630 (5th Cir.2002) (citing Flowers v. S. Reg’l Physician Servs., 247 F.3d 229, 235 (5th Cir.2001)). “Although our review is de novo, ... our standard of review with respect to a jury verdict is especially deferential.” Flowers, 247 F.3d at 235 (internal quotations omitted) (quoting Brown v. Bryan County, Okla., 219 F.3d 450, 456 (5th Cir.2000), cert. denied, 532 U.S. 1007, 121 S.Ct. 1734, 149 L.Ed.2d 658 (2001)). Therefore, JMOL should only be granted if the facts and inferences point so strongly and overwhelmingly in the movant’s favor that reasonable jurors could not reach a contrary conclusion. Id.
Under Federal Rule of Civil Procedure 50, “judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, [if] there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.” Ford v. Cimarron Ins. Co. 230 F.3d 828, 830 (5th Cir.2000) (internal quotations omitted) (quoting Foreman v. Babcock & Wilcox Co., 117 F.3d 800, 804 (5th Cir.1997)). In entertaining a Rule 50 motion, the court must review all of the evidence in the record, and draw all reasonable inferences in favor of the nonmoving party. Ellis v. Weasler Eng’g, Inc., 258 F.3d 326, 337 (5th Cir.2001), as amended, (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The court may not make *288 credibility determinations or weigh the evidence, as “[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.” Reeves, 530 U.S. at 150-151, 120 S.Ct. 2097 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, in reviewing the record as a whole, the court must disregard all evidence favorable to the moving party that the jury is not required to believe. Ellis, 258 F.3d at 337 (citing Reeves, 530 U.S. at 151, 120 S.Ct. 2097).

II. The Sabine Pilot Criteria

In application to a Sabine Pilot claim, the trial court determines as a matter of law whether the provision at issue makes its violation a criminal offense, while the jury decides whether the employee’s conduct would have been “an illegal act.” Sabine Pilot Service, Inc. v. Hauck, 687 S.W.2d 733, 736 (Tex.1985); Texas Pattern Jury Charges-Business, Consumer & Employment PJC 107.3 (2000 ed.). The majority opinion rests on affirming the district court’s reversal of the second of these steps. Although the majority concedes that a jury could have reasonably found that Klumpe was fired for not getting Es-camilla’s release,[1] the majority affirms the district court’s finding that there is no legally sufficient evidentiary basis for a reasonable jury to find that seeking Es-camilla’s release would have been “an illegal act” had Klumpe tried. I disagree that the standard of review for a JMOL has been met on this pivotal issue. I would reverse the district court’s grant of a JMOL and would reinstate the jury verdict.[2]
Klumpe bases his Sabine Pilot claim on section 32.46 of the Texas Penal Code, which states in relevant part that “a person commits an offense if, with intent to defraud or harm any person, he, by deception ... causes another to sign or execute any document affecting property ... or the pecuniary interest of any person.” Thus, in order to find that Klumpe would have committed an illegal act had he sought Escamilla’s release, the facts presented at trial must have been sufficient for a reasonable jury to find that such an act would have necessarily involved deception.
As amended effective May 21, 1997, section 32.46 adopts the definition of “deception” contained in Texas Penal Code § 31.01, which states in relevant part:
(1) “Deception” means:
(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true; [or]
(B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true[.] (emphasis added).
*289 No evidence at trial supported a finding of deception under Texas Penal Code § 31.01(1)(B).[3] Under Texas Penal Code § 31.01(1)(A), however, the jury could have reasonably found that Klumpe would have been guilty of deception had he tried to obtain Escamilla’s waiver. IBP claims that the statute requires affirmative deception on Klumpe’s part. The plain meaning of the statute, however, does not contain this requirement. On its face, the statute merely requires “creating or confirming by words or actions.'” (emphasis added). Tex. Penal Code § 31.01(1)(A). For a finding of deception — and thus potential criminal liability — by seeking Es-camilla’s release Klumpe would have had to confirm by words or actions the representations made by IBP in the orientation script and the Summary Plan Description concerning the WISP program, and those representations must have actually existed and been known by Klumpe to be deceptive.

III. IBP’s Deceptions

As discussed in the majority opinion, new IBP employees receive a booklet containing a summary of WISP benefits, called the Summary Plan Description (“SPD”) at orientation. The script read by an IBP supervisor at that orientation states that the SPD “tells you just about everything you need to know about [WISP], including your rights and responsibilities.” However, the WISP legal document contains a longer and more detailed explanation of WISP benefits. The WISP legal document is kept in IBP’s Health and Safety Department, and is not provided to employees unless they request it. The majority concludes that no inconsistencies exist between the orientation script, the SPD, and the WISP legal documents, and thus no deception could have occurred. Not only do I disagree that no inconsistencies exist, but I particularly disagree that a reasonable jury could not have found the inconsistencies in the materials to be deceptive such that if Klumpe remained silent or encouraged Escamilla to sign the waiver, he would have similarly been deceptive.
The first alleged inconsistency concerns lifetime payments under WISP. The SPD states that “if a covered injury or illness leaves you unable to return to any work whatsoever, the program provides lifetime payments.” The WISP legal document states that lifetime payments will only be given if the injury fits one of six categories enumerated in the legal document, such as total and permanent loss of sight in both eyes. For other injuries not so enumerated, payment will not exceed 401 weeks.
While the majority concludes that the language concerning being “unable to return to any work whatsoever” is a prerequisite that suggests a severe disability, the six disability categories listed in the WISP materials are not exhaustive. In particular, all but one of the six categories cover only physical injuries. The sixth category does cover injuries “to the skull resulting in incurable insanity or imbecility,” but there are a wide range of other work-related Alnesses could leave a person un *290 able to return to any work whatsoever. Debilitating clinical depression, for example, might well be the result of the injury that Escamilla suffered, and it would definitely not be covered. More importantly, a reasonable jury could find that the SPD was deceptive in this regard.
The second alleged inconsistency concerns the binding nature of arbitration under WISP. According to IBP’s orientation script, “by the terms of the Program as submitted to and supervised by the United States Department of Labor, IBP is bound to honor the arbitrator’s decision.” The majority opinion notes that under the governing power of the Federal Arbitration Act, parties retain the right to appeal an arbitration award that results from the arbitrator’s abuse of authority or bias, as was the case in the Glover complaint presented as anecdotal evidence of this misrepresentation at trial. Team Scandia, Inc. v. Greco, 6 F.Supp.2d 795, 798 (S.D.Ind.1998). Nevertheless, an IBP managerial employee, James Crow, testified that nowhere in the IBP documents does it state that IBP can appeal the decision if it decides to do so. Nor could I find any reference in my review of the documents submitted to this Court.[4] Whether or not an abuse of the arbitrator’s authority existed in Glover’s case, testimony at trial concerning Glover merely illustrated and provided for the jury sufficient evidence to find that, despite telling employees that IBP is bound to honor the arbitrator’s decision — without any mention of exceptions — IBP can and does appeal arbitration decisions.[5]
The final deception concerns the “Restricted Duty Program.” New employees are told that, if they are injured on the job, IBP will assign that employee “to the restricted duty program in accordance with the restrictions assigned by your doctor.” However, the program includes deadlines not disclosed to the employees during orientation. For example, once the employee reaches “maximum medical improvement,” the employee has thirty days to find a job within the plant that will meet the restrictions imposed by the treating physician. If the employee cannot find a job within that thirty-day period, then the employee is placed on a twelve-month leave of absence without pay. If the employee cannot find a job within that twelvemonth period, the employee is terminated.
Whole the Restricted Duty Program is not part of WISP, Klumpe nonetheless presented evidence at trial concerning the program that adequately demonstrated IBP’s failure to provide full disclosure of its terms. This evidence, combined with the above discussed inconsistencies, was clearly enough for the jury reasonably to conclude that deception would have occurred had Klumpe sought Escamilla’s release because the information given to IBP employee’s concerning the WISP prog-am and the Restricted Duty Program was misleading and deceptive. Thus, in order to secure Escamilla’s signature, Klumpe would have had to “confirm” the benefits of the program by remaining silent about how the program really worked.[6] Klumpe *291 testified that no one with an injury such as Escamilla’s would sign the waiver if he were aware of the misrepresentations made to him, and of the actual benefits available under WISP and the restricted duty program. This evidence presented by Klumpe is sufficient to support an inference that Escamilla would not have signed a waiver if the benefits available under WISP and the restricted duty program had been fully and accurately presented to him.
Moreover, Klumpe presented evidence at trial that, IBP did not correct the inconsistencies between the information presented to new employees at orientation and the actual benefits available to them under WISP and the restricted duty program. For example, IBP employee Missy Britt testified that she was the first person who generally would consult with an injured worker about signing the waiver. Britt also testified that she did not discuss any of the differences between actual benefits provided and the orientation information, and did not discuss the time limits associated with the Restricted Duty Program when consulting with an injured worker. Klumpe himself also testified that, as an IBP manager, he previously had secured waivers from employees without correcting any of the misrepresentations made during orientation, and that he was fully aware that IBP wanted the waivers signed and did not want any misrepresentations to be corrected. Estrada and Glover gave anecdotal testimony concerning the Restricted Duty Program, both relating their experiences that the program did not function as stated in the orientation script or the SPD. Glover also testified that IBP appealed the arbitrator’s decision in his case, something he did not believe was a possibility according to the materials he had received. Finally, Suther admitted in his testimony that employees were misled during orientation.[7]

IV. The Property Interests at Stake .

An offense under section 32.46 is not complete until a document that would affect property or a pecuniary interest is executed. Goldstein v. State, 803 S.W.2d 777, 789 (Tex.App.—Dallas 1991, pet. ref'd) (citing Mills v. State, 722 S.W.2d 411, 416 (Tex.Crim.App.1986)). The terms “property” and “pecuniary interest” are not defined under section 32.46,-and therefore are to be given their plain and ordinary meanings. Goldstein, 803 S.W.2d at 791 (citing Floyd v. State, 575 S.W.2d 21, 23 (Tex.Crim.App.1978)). The term “property” in section 32.46 encompasses an individual’s cause of action against another person under the law. Fisher v. State, 803 S.W.2d 828, 830 (Tex.App.—Dallas 1991, pet. ref'd) (citing Black’s Law Dictionary 1095 (5th ed. 1979)). By signing the waiver, Escamilla would have relinquished his personal injury cause of action against *292 IBP, and therefore the waiver would have affected his “property,” irrespective of the outcome of any such lawsuit. Furthermore, in a situation where the outcome of a lawsuit was just as speculative as Escam-illa’s personal injury suit viewed ex ante, a Texas appellate court has found that even potential legal liability affects an individual’s pecuniary interest so as to justify conviction of securing execution of a document by deception. Id. The stipulated facts alone therefore are sufficient to support the jury’s finding that executing the waiver would have affected Escamilla’s property and/or pecuniary interest, as required to constitute a violation of section 32.46.

V. The Evidence Supporting the Jury’s Verdict

Because a Sabine Pilot cause of action will always involve an unconsummated crime, any testimony about what Escamilla would have done, and why he would have done it, had Klumpe asked him to sign the waiver inevitably would be speculative. Moreover, if done with the intent to defraud by deception, any attempt Klumpe would have made to secure Escamilla’s signature on the waiver would have subjected Klumpe to criminal liability, whether or not that attempt ultimately proved successful. See Tex. Penal Code § 31.01(1)(A). Klumpe meets his Sabine Pilot burden only if he showed that IBP required him to commit a criminal violation in order to keep his job; a showing that Klumpe had a good-faith belief that the required conduct would constitute a violation of criminal law will not suffice.[8] Williams v. Enserch Corp., 2000 WL 31802 at *3 (Tex.App.-Dallas, Jan. 18, 2000).
Contrary to the district court’s holding that “[t]he record in this case is devoid of evidence that those omissions or discrepancies were likely to affect the judgment of Escamilla in the case before this Court,” the evidence was sufficient to support an inference that, if asked by Klumpe, Es-camilla would have signed the waiver in reliance on misrepresentations made by IBP.[9] The testimony of the person who signed the relevant document is not required to prove a violation of section 82.46. Smith v. State, 681 S.W.2d at 74. The testimony of another person who, based on his personal knowledge, is competent to testify about the state of mind of the signor, is legally sufficient to support a conviction. Id. In the instant case, the jury could reasonably have inferred that Klumpe had personal knowledge of Es-camilla’s state of mind after the injury, as *293 Escamilla was Klumpe’s stepson. Klumpe testified that no one with Escamilla’s injury would have signed the waiver if the benefits actually available under WISP and the restricted duty program had been known to that person, and that Escamilla, having had the available benefits misrepresented to him, would have signed the waiver if Klumpe had asked him to do so.
Furthermore, the inconsistencies between the orientation materials and actual plan benefits adduced by Klumpe are sufficiently material to support an inference of reliance. Although the availability of lifetime benefits for total permanent disability arguably would not have influenced Es-camilla’s decision regarding the waiver due to the nature of his injury,[10] whether arbitration would have been binding if any dispute over Escamilla’s benefits under WISP arose is an issue that cuts across all covered injuries. The jury reasonably could have inferred that an individual with an injury as serious as Escamilla’s would have found this latter fact material to his decision whether to accept WISP benefits.
In addition, based on Estrada’s testimony regarding his experience with the Restricted Duty Program, the jury also could have inferred that the misrepresentations regarding that program would have been material to Escamilla’s decision. The majority opinion counters that the Restricted Duty Program is separate from the WISP, and that signing the waiver is not an agreement to participate in restricted duty. But by signing the waiver, Escamil-la would have relinquished his right to seek damages for future lost earnings after maximum medical improvement if he could not secure a placement within the program’s time limitations. Escamilla had not been informed of those time limitations, and did not understand how they might have affected the amount of his future lost earnings. Accordingly, IBP’s misrepresentations about the benefit actually available under the Restricted Duty Program reasonably could be believed to have a direct impact on Escamilla’s willingness to sign the -waiver.

VI. The Roles of Jurors and Judges

In conclusion, the evidence presented at trial does not meet the standard for a JMOL. Rather, the jury had enough legally sufficient evidentiary support to reasonably find in Klumpe’s favor. Assessing credibility and making factual determinations are uniquely within the province of the jury. The jury hears and sees witnesses and evidence first hand — a privilege that is forever lost when trial ends. Thus, when the majority writes that “the only evidence we found of an IBP employee having admitted to misrepresentation came from Klumpe’s own testimony”[11] (a proposition I reject), it fails to explain why Klumpe’s testimony would not be sufficient for the jury. The jury can reasonably decide who to believe, and who to disbelieve. If judges are willing to set aside jury verdicts as readily as was done in this *294 case, the entire rationale for the civil jury system is sharply attenuated. At a practical level, trial judges can no longer be credible in explaining to jurors that — although their service comes at a significant personal cost to them, their families, and their co-workers — the contribution they make is indispensable.
This case is peculiarly ill-suited to have judges substitute their opinions in place of the jurors’ verdict. We can leave aside for the moment the fact that the jury listened to nine days of testimony and deliberated for one more day. We can likewise discount the obvious fact that all jurors were able to judge the demeanor of the witnesses and then had the opportunity to compare their reactions. The key point is even more fundamental. Whether an employer’s explanation of specific employee benefits is or is not deceptive is something that should be determined by men and women who are chosen from the community in which the conduct occurred and who likely have had relevant and diverse experiences in receiving explanations of employment benefits and subsequently trying to realize those benefits. In other words, such a determination is one for which a jury is quintessentially appropriate. Conversely, if any group is uniquely inappropriate to make such a determination, surely it is Article III federal judges who enjoy the otherwise almost unheard of luxury of lifetime job tenure and employee benefits many of which are backed by the full faith and credit of the United States.
A jury’s verdict should be disturbed only when the stringent requirements of JMOL are met. They are decidedly not met in this case. Accordingly, I respectfully dissent, and would reverse the district court’s decision and reinstate the jury verdict.

. The majority also concedes that the jury could have reasonably decided that IBP’s purported reason for Klumpe’s termination — the removal of the crewing guidelines — was pre-textual, that IBP attempted to put pressure on Klumpe to obtain Escamilla's waiver, and ■ that IBP was motivated to get Escamilla's release by any means necessary.

. Although I would reinstate the jury's verdict, I would review the amount of punitive damages and possibly reduce them to more closely established precedent. In view of the majority's opinion, I feel it unnecessary to analyze further the punitive damages issue, or to consider IBP’s ERISA preemption argument in this dissenting opinion.

. The majority’s opinion correctly states that Klumpe could have possibly faced liability under the Texas Penal Code § 31.01(1)(B) definition of deception had the jury been instructed on accomplice liability. Under Texas law, however, “the jury is not free to find the defendant guilty as an accomplice unless the court’s instructions authorize it to so and include the essential elements of proof for making such a finding.’’ Plata v. State, 926 S.W.2d 300, 304 (Tex.Crim.App.1996). While such an instruction would have benefited Klumpe by providing an alternative basis for criminal liability under the statute, as discussed above it is not dispositive on the issue of liability as accomplicity is not required under 31.01(1)(A). Tex. Penal Code § 31.01 (1)(A).

. These documents included the orientation script, the SPD, and the WISP legal document.

. In fact, the orientation script states that "because the appeal process [to a neutral arbitrator] is fairly simple, an attorney’s service is usually not needed unless you want to hire one.” The help of an attorney would almost certainly be needed if IBP appealed an arbitrator's decision. This kind of statement in the orientation script only adds to the list of evidence the jury could have used in determining the SPD and orientation script were deceptive.

.In order to illustrate how the program affected an employee who sustained an injury, Klumpe presented the testimony of Andres Estrada, an IBP employee who suffered an *291 injury very similar to Escamilla's approximately two years prior to Escamilla's accident. After his injury, Estrada signed a waiver, and ultimately received approximately $77,000 in compensation from IBP. Escam-illa, in contrast, received approximately $1.9 million from IBP in settlement of his personal injury suit. Estrada also testified regarding the difficulties he encountered returning to work at IBP after his injury, specifically as a result the time deadlines and placement limitations of IBP's restricted duty program. Estrada’s experience under WISP and the restricted duty program demonstrated the limitations of those benefits for an individual with Escamilla's injury, particularly when considered in light of the significantly greater recovery obtained by Escamilla as a result of his personal injury suit.

. Suther, in his testimony, admitted that IBP's orientation and SPD materials were false if IBP was seeking to vacate the arbitrator's decision in the Glover case, which the record reflects as true.

. Because the Sabine Pilot standard is an objective one, i.e. did the employer require the employee to commit a crime or face termination, the suggestion running through IBP’s pleadings and the district court's opinion that Klumpe's claim is somehow tainted because his true motivation was loyalty to his stepson, not fear or criminal prosecution, is irrelevant. Even if such a factual inference were consistent with the jury's verdict and thus could be considered by the Court, Klumpe’s subjective motivation for refusing to obtain Escamilla's signature does not affect his Sabine Pilot claim.

. IBP itself cites the following exchange from the record:
Q: Do you believe if you had gone to Chris and asked him to sign the waiver that we would have signed it?
A: Sure he would have.
In the context of Klumpe's testimony in its entirety, this statement does not necessitate an inference that Escamilla would have signed the waiver, irrespective of the misrepresentations allegedly made to him, simply because his stepfather asked him to do so. However, when viewed in the light most favorable to Klumpe’s case, it does seem to indicate, misrepresentations having previously been made by others, that Klumpe simply would have had to maintain his silence— knowing of the misrepresentations — and that Escamilla would have signed the form upon being asked to do so by his stepfather.

. For example, despite the severity of Estrada's injury, almost identical to the one suffered by Escamilla, he did return to work. Further testimony by Estrada revealed, however, that he had to eventually terminate his employment with IBP because of an inability to find suitable work there following his injury. Thus, although the availability of lifetime benefits for total permanent disability arguably would not have influenced Escamilla under the definition of qualifying injuries provided in the complete WISP document, it is conceivable that Estrada's experience could have lead Escamilla to question his ability to find work after such an injury.

. Klumpe testified that in his meeting with Suther following Escamilla’s injury, James Crow, another IBP supervisor, told Klumpe that IBP would "f— him over just like we do everyone else.”