In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00011-CR**
_____

**CALVIN GARY WALKER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 14-19966**

## OPINION

Appellant Calvin Gary Walker challenges his conviction for securing execution of a document by deception. *See* Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 2, Tex. Gen. Laws 1045, 1046 (amended 2011) (current version at Tex. Penal Code Ann. § 32.46).[1] In nine issues on appeal, Walker challenges the

_____

[1]We note that in 2014, Calvin Walker filed applications for pretrial writs of habeas corpus seeking to dismiss his cases on double jeopardy and due process grounds. According to the pretrial writ relevant to the appeal here, Walker alleged the indictment concerned the same conduct covered by his federal plea agreement,

1

constitutionality of section 32.46 of the Texas Penal Code, denial of his motion to quash the indictment, legal sufficiency of the evidence, admission of evidence, jury charge instruction, and the restitution order. We affirm the trial court's judgment.

BACKGROUND

In 2014, by indictment, the State charged Walker with securing execution of a document by deception, a first-degree felony. The State alleged that Walker

> with intent to harm or defraud Beaumont Independent School District, by deception, to wit: by submitting fraudulent invoices, cause[d] Jane Kingsley to sign or execute a document affecting the pecuniary interest of Beaumont Independent School District, the value of said pecuniary interest being $200,000 or more . . . .

---

and Walker complained the trial court denied his application without conducting an evidentiary hearing. *See Ex parte Walker*, 489 S.W.3d 1, 3 (Tex. App.—Beaumont 2016, pet. ref'd). After concluding the State had not forfeited the dual sovereignty doctrine, the trial court found that Walker's double jeopardy claim lacked merit and denied Walker's applications. *See id.* at 6. The trial court also determined that based on Walker's petitions and attached documents, it could render a proper ruling without further development of Walker's claim. *See id.* at 8. Walker appealed the ruling denying his pretrial applications. This Court affirmed the trial court's rulings in those appeals, holding that Walker was not entitled to relief. *See id.* at 14. In 2017, Walker filed more applications seeking habeas relief. He asked the trial court to dismiss the indictments on double jeopardy grounds, and he challenged the constitutionality of the separate sovereign exception. The trial court also denied those applications, finding Walker's claims without merit. Walker appealed, and this Court affirmed the trial court's rulings in the opinion the Court issued in 2018. *See Ex parte Walker*, Nos. 09-17-00472-CR, 09-17-00473-CR, 09-17-00474-CR, 09-17-00475-CR, 09-17-00476-CR, 09-17-00477-CR, 2018 WL 1864618, at *1, 3-4 (Tex. App.—Beaumont Apr. 18, 2018, pet. ref'd) (mem. op. not designated for publication).

2

The State attached a check from Beaumont Independent School District ("BISD") for $1,285,064 made payable to Walker's Electric Company ("Walker's Electric") to the indictment. The attached check was executed by Jane Kingsley, who was the Chief Financial Officer for BISD in May 2009.

Walker filed a Motion to Quash Indictments, alleging that the indictment failed to give sufficient notice of the conduct relevant to his defense, thereby violating his constitutional rights and the Texas Code of Criminal Procedure. According to Walker's motion, the State failed to attach the invoices the State alleged Walker fraudulently submitted. In his First Amended Motion to Quash Indictments, Walker also claimed section 32.46 of the Texas Penal Code is unconstitutionally vague as applied to him. According to Walker, the State provided no notice of what "value" means in the context of a purported victim's pecuniary interest because section 32.46 fails to define "pecuniary interest." Walker argued that the indictment is insufficient to give notice as to what about the allegedly fraudulent invoices the State contends is deceptive. Walker also claimed that section 32.46 of the Texas Penal Code is unconstitutionally vague "[o]n its face."

In August 2019, the trial court held a pre-trial hearing on Walker's request to quash the indictment, during which the State agreed to provide the fraudulent invoices that apply to the indictment. Based on the State's agreement to tender the invoices to Walker, the trial court ruled that the trial court's failure to grant the

motion to quash could not have any bearing on Walker's ability to prepare his defense. The trial court asked that the State either amend the indictment or provide some particularity in writing about what is wrong with the invoices that makes them deceptive. Although Walker's counsel argued that providing the invoices does not cure the fault in the indictment, the trial court indicated that the State's effort would provide adequate notice.

As to Walker's claim that section 32.46 is unconstitutional, Walker's counsel argued that by failing to provide a statutory definition for the term "pecuniary interest," and providing no definition of the "value" of the damages the defendant is alleged to have caused, the statute is unconstitutional. Walker's attorney noted that the term "value" is defined in section 32.02 of the Texas Penal Code. Walker's counsel explained that section 32.46 concerns property, service, or pecuniary interest, and the indictment only alleges pecuniary interest. Walker's counsel argued that the statutory definition of "value" applies to all sections of Chapter 32, and that definition does not provide a formula by which to calculate the value of "pecuniary interest" under section 32.46. According to Walker's counsel, by failing to provide a standard or formula for calculating the value of the "pecuniary interest" allegedly lost, section 32.46 is unconstitutionally vague since it fails to show the defendant how to determine the alleged value of the fraud. The State argued that the statute is constitutional, the Court of Criminal Appeals has found it adequate, and that the

terms that are not statutorily defined are defined by the commonly understood meaning for the term. The trial court agreed and denied the motion to quash, finding the statute is not unconstitutionally vague since the term "pecuniary interest" has a commonly understood meaning to include money.

In September 2019, the parties tried the case to a jury. During the trial, the State called Jane Kingsley, who was acting in her capacity as BISD's Chief Financial Officer when she signed the check BISD issued to Walker's Electric for $1,285,064. Kingsley explained that she was responsible for accounts payable resulting from purchases made by BISD, and her responsibility included reviewing invoices from Walker's Electric and signing checks to contractors employed by BISD. Kingsley testified that the procedures she followed when working for BISD required her or one other person to manually sign checks exceeding $1,000,000. Kingsley also testified that she required documentation to support all the checks she signed on behalf of BISD. According to Kingsley, on May 29, 2009, she signed check number 557268 for $1,285,064, a check BISD made payable to Walker's Electric, a company owned by Walker. Kingsley explained that check number 557268 covered two accounts relevant to BISD's business with Walker's Electric, and the accounts included South Park Middle School ("South Park") and Regina Howell Elementary ("Regina Howell"). Kingsley explained Walker's Electric provided her with documents relevant to check number 557268, and those documents included

5

delivery receipts from Summit Electric Supply ("Summit") to Walker's Electric. Kingsley also testified that Walker submitted two requests to pay an invoice from Walker's Electric to BISD against the blanket purchase order that BISD had issued for the jobs at South Park and Regina Howell, and those requests corresponded with invoice numbers 2210 and 2211, which are referenced on check number 557268.

Kingsley explained that invoice number 2211 in the amount of $642,532 is dated April 24, 2009 and references work Walker's Electric represented it did at South Park. Kingsley also explained that invoice number 2211 includes a ten percent markup of $58,412, because BISD allowed Walker's Electric to charge a ten percent markup above the actual cost of the materials that he used on that job. Kingsley testified that invoice number 2210, which was for $642,532, contains the same ten percent markup, and references work that Walker's Electric represented it performed at Regina Howell. According to Kingsley, invoice numbers 2210 and 2211 total $1,285,064, and because Walker was asking for reimbursement for materials he had paid for, she requested that Walker provide additional documentation of the costs for the materials included in the two invoices. Kingsley testified that she signed check number 557268 based on the documentation Walker provided to support the delivery of those materials and their cost.

As to the actual cost of materials at South Park, Kingsley explained that Walker submitted a delivery receipt from Summit to Walker's Electric and a copy

6

of check number 3498 from a Capital One account that indicated Walker's Electric paid Summit for the delivery. Kingsley explained the delivery receipt purportedly signed by T. Trahan shows on its face that Summit received check number 3498 drawn on Walker Electric's Capital One account. Kingsley explained that the delivery receipt tied to check number 3498 lists items totaling $584,120, references account number 1012072 and sales order number 1129758, shows a delivery date of May 19, 2009, includes Toby Trahan's contact information, and is signed by Walker and stamped as paid. According to Kingsley, the stamped delivery receipt appeared to her to have been stamped as paid by Summit.

Concerning Regina Howell, Kingsley testified that Walker submitted a second delivery receipt showing that Walker's Electric purchased $584,120 in materials from Summit. Walker's Electric provided BISD with a copy of check number 3497 for $584,120 from Walker's Electric's Capital One account, which says it is payable to Summit. The second delivery receipt is signed by T. Trahan, references check number 3497, and contains a stamp representing Walker paid Summit for the materials that are shown on the receipt. According to Kingsley, she would not have signed the $1,285,064 check for BISD which was made payable to Walker's Electric had she known the delivery receipts and the corresponding invoices Walker provided to BISD were false.

On cross-examination, Kingsley testified she was generally aware of BISD's projects to build temporary campuses for South Park and Regina Howell using portable buildings and to rebuild both schools. Kingsley testified that Walker gave BISD a quote bidding for electrical work for Regina Howell to supply power to forty trailers, including the labor and materials for that work. According to Kingsley, based on Walker's quote, BISD's purchasing order agent, Naomi Lawrence Lee, issued a blanket purchase order to Walker's Electric so Walker could order materials for those jobs. Kingsley testified that several people would have reviewed the documentation that Walker's Electric attached to its quote before approving the blanket purchase order. Kingsley acknowledged that BISD and Walker's Electric had an agreement with Walker to perform the work, but Kingsley explained the amounts paid under the purchase order might not equal Walker's quote if there were change orders for the work Walker's Electric performed at those schools. Kingsley also testified that Walker's Electric's quote does not indicate that Walker's Electric intended to sell materials it already owned to use for Regina Howell.

Kingsley further testified that when Walker submitted invoice 2210 for Regina Howell, which included a ten percent markup on materials, she asked Walker to provide additional information supporting his invoice. Kingsley explained that when Walker submitted a request to pay invoice 2210, his invoice would have been attached for payment against the purchase order. Kingsley testified that Walker

8

submitted a similar quote to supply the electrical work needed to power approximately forty temporary trailers at South Park, which included labor, materials, and a ten percent markup, along with invoice 2211 and a request to pay invoice 2211. Kingsley explained that nothing on the face of the Summit delivery receipts or the two checks from Walker's Electric to Summit show that she or anyone in her office reviewed the supporting documents Walker provided to BISD. Kingsley maintained throughout her testimony that without the supporting documents Walker's Electric provided BISD, she would have never authorized payment on invoices 2210 and 2211.

On redirect, Kingsley reiterated why she asked for more documentation to support invoices 2210 and 2211, and Kingsley agreed that if the Summit delivery receipt to Walker's Electric is false, invoice 2211 is also false, and she would not have issued Walker's Electric a check if the supporting documents were false. According to Kingsley, Walker never told BISD he used his own materials on the jobs at South Park and Regina Howell, and if that had been the case, he could not properly document the cost of his materials by providing the Summit delivery receipts. Kingsley explained the documents that Walker provided to BISD represented that he bought the materials for those jobs from Summit, at a total cost consistent with the checks Walker's Electric made payable to Summit.

9

Chris Rybacki, a Process Excellence Manager with Summit, testified that he reviewed Summit documents pursuant to a business record request. Rybacki testified that Summit is a wholesale distribution house that sells products and materials to electricians. Rybacki also testified that he had dealt with Walker on many occasions. Rybacki explained that Summit's current computer system, which maintains all records regarding quotes, invoices, and deliveries, was in place in 2009. According to Rybacki, Summit gave Walker Quotation/Purchase Agreement Number 2000334840 on April 24, 2009. Rybacki explained that Summit's quotes include Summit's cost and sale price, which is the sale price after the markup. Regarding the items in Quotation/Purchase Agreement Number 2000334840, which is admitted into evidence as State's Exhibit 4-A, Rybacki testified that Summit does not carry some items listed in the purchase agreement, and other items in the agreement are priced abnormally or "ridiculously high."

State's Exhibit 4-B, which is dated May 19, 2009, is an original invoice from Summit to Walker's Electric. The invoice references sales order number 1129753 and Regina Howell, and according to Rybacki, it shows that Walker picked up a screwdriver priced at $15.02 and was invoiced for the screwdriver that same date. Rybacki testified that State's Exhibit 4-C is a delivery receipt for the screwdriver, and the delivery receipt contains the same sales order number and account number as State's Exhibit 4-B. Rybacki authenticated both exhibits as documents that came

10

from Summit. Rybacki explained that State's Exhibits 4-D and 4-E, which reference South Park, are the original invoice and delivery receipt for a pair of protective eyewear. Rybacki also authenticated Exhibits 4-D and 4-E as documents that came from Summit, and as documents that have the same account number as Exhibits 4-B and 4-C.

Regarding State's Exhibit 1-A, the delivery receipt from Summit to Walker's Electric totaling $584,120 and referencing South Park, Rybacki explained that Exhibit 1-A's sales order number is 1129758, which is the same sales order number as Exhibit 4-D. Rybacki testified that his computer search of sales order number 1129758 showed that Exhibit 4-D is the genuine document. According to Rybacki, State's Exhibit 1-A could not have come from Summit, because the document could not possibly have been generated by Summit's computer system. Rybacki also testified that State's Exhibit 1-C, the delivery receipt from Summit to Walker's Electric totaling $584,120 and referencing Regina Howell, could not have come from Summit. According to Rybacki, Summit never sold Walker the supplies that are in State's Exhibits 1-A and 1-C, and Summit did not receive check numbers 3497 and 3498 from Walker's Electric. Finally, Rybacki testified that State's Exhibits 4-F and 4-G are genuine Summit documents, which show the amount Summit billed Walker's Electric for a series of switchboards that Walker's Electric ultimately used in the work it performed at Regina Howell and South Park. According to Rybacki,

11

the exhibits show Summit sold Walker's Electric switchboards for a price much lower than the amount Walker's Electric charged BISD and which BISD paid.

Ndubisi Nwachuku, a supervisor special agent with the FBI, testified that in December 2010, he and other agents searched Walker's residence and later interviewed Walker. Nwachuku testified that Walker agreed to answer questions about his contract with BISD, and that Walker stated in his interview that BISD reimbursed Walker's Electric for the materials he installed at the schools based on an agreement that allowed him to charge cost plus ten percent. Nwachuku explained he questioned Walker about documents that Walker's Electric submitted to BISD, including invoices 2210 and 2211, the Summit delivery receipts discussed above, and the checks drawn on Walker's Electric's Capital One account and made payable to Summit for the materials previously discussed. Nwachuku testified that during the interview, Walker acknowledged the documents were his and claimed to have presented the checks to Summit after Summit delivered the items reflected in the delivery receipts. Walker also told Nwachuku that one of the checks he gave Summit for the materials was returned to him while the other was paid. Nwachuku explained that agents found the two checks in Walker's attic.

Nwachuku testified that when he confronted Walker about Trahan being one of Walker's employees, Walker stated he did not hire Trahan to help him defraud BISD. Nwachuku further testified when he asked Walker if the checks to Summit

were ever paid out of his account, Walker stated that Summit never accepted the checks, because Summit was going to bill him after the items were delivered. Nwachuku explained that when he asked Walker why Summit had not billed him, Walker said that Summit was incompetent, but that he was not responsible for Summit's business practices. Nwachuku also explained that Walker's Electric did not have sufficient funds in its bank account to pay the two checks it issued to Summit, but Walker claimed he was going to put sufficient money in the account to cover the checks and that his accountant was responsible for handling that. Nwachuku testified that when he told Walker that Summit had no record of delivering the items in the delivery receipts to Walker's Electric, Walker claimed he received the supplies, and he was not responsible for the manner Summit chose to conduct its business.

Walker also admitted in the interview with Nwachuku that Walker's Electric sent BISD (1) invoice numbers 2210 and 2211, (2) the delivery receipts from Summit relevant to those invoices, and (3) the checks drawn on Walker's Electric's Capital One account and made payable to Summit. Nwachuku explained that during the search, Walker helped him recover several items from inside Walker's home, including a paid stamp that, according to Nwachuku, appears similar to the stamp used to stamp "paid" on the Summit delivery receipt for the Regina Howell job. Other items recovered in the search of Walker's home included the original checks

drawn on Walker's Electric Capital One account and made payable to Summit, a document that shows the actual price Walker's Electric paid for the switchboards that were later installed by Walker's Electric at the two schools, the original of invoice number 2210 and other altered versions of that invoice, the original Summit delivery receipts for a pair of protective eyewear and a screwdriver along with other altered versions of those receipts that included the signature of Trahan. On cross-examination, Nwachuku testified that in Walker's interview, he told agents that he was not required to send copies of the checks to BISD but had done so accidentally. Finally, Nwachuku testified that agents found check numbers 3497 and 3498, and the word "void" was marked on the checks.

Ronald Reynolds, a licensed master electrician, testified as an expert for the State. According to Reynolds, he has been in the business of providing estimates for electrical work for about thirty-five years. Reynolds explained that based on a request by the prosecutors, he inspected the Regina Howell and South Park temporary campuses and provided the State with an electrical bid for the electrical systems that Walker's Electric installed at the two schools in 2009. Reynolds explained that in addition to his inspection, he used the plot plan and the invoices from the suppliers that provided the materials for the work performed at those schools to create a bid. Reynolds testified that after reviewing State's Exhibit 4-A and the prices charged for the materials, he concluded that Walker's Electric

14

represented to BISD that it paid much more for the materials than it actually paid. Reynolds also explained that some of the materials listed in Walker's Electric documentation are false, because during his inspection, he did not observe certain materials at either campus.

Reynolds testified that he generated a report showing the actual cost for the materials that Walker's Electric used at the two schools is $58,552.09, a figure that includes sixteen percent for overhead and a ten percent profit. Reynolds testified that in his opinion, the appropriate charge to BISD for the materials installed for South Park should have been $74,712.47. Regarding Regina Howell, Reynolds explained the actual cost of the materials Walker's Electric used at that school is $53,790.99. After adding sixteen percent for overhead and another ten percent for profit, the cost for the materials that Walker's Electric should have invoiced would have been $68,637.31. According to Reynolds, the combined total actual cost for the materials used for the South Park and Regina Howell jobs was approximately $111,000.

Walker called Debra Cormier in presenting his defense. Cormier started working for BISD as a maintenance electrician in 2008. Cormier testified that when Hurricane Ike hit Beaumont, a lot of electrical work was required. Cormier explained that Walker's Electric was BISD's outside contractor on jobs too large for electricians on BISD's staff, and Cormier worked with Walker on both the South Park and Regina Howell jobs, which were large jobs that included wiring forty

15

portable buildings on each campus. Cormier testified that the leftover cable from the job was delivered to BISD's maintenance shop and the leftover poles were stored in BISD's lay down yard and parking lots. According to Cormier, some of the material that was not used at those schools was stored in the warehouse and later used on other BISD projects.

Walker also called Lee in presenting his defense. According to Lee, she was employed as BISD's director of purchasing from 2008 to 2014. Lee explained that she was responsible for procuring goods and services, work that included issuing contracts and purchase orders. Lee testified that in 2007, BISD voters passed a $386 million bond to improve facilities in BISD, work that required new construction and renovation of many of the school's existing buildings. Lee testified that in 2008 and 2009, Walker's Electric had the maintenance contract for all BISD electrical work. According to Lee, the projects at South Park and Regina Howell involved new construction, so the electrical work for those jobs did not fall under Walker's maintenance contract. According to Lee, the construction work at those campuses were paid from the school's bond account. Lee testified that before she signed the blanket purchase order, Terry Ingram and other people with authority reviewed and approved Walker's quote. Lee further testified that she understood that once she signed the purchase order with a contractor, BISD was bound by the terms of its agreement.

16

Lee testified that Walker's quote for the work Walker's Electric did at the South Park and Regina Howell schools was a standalone contract because it was paid for by using funds from the bond account, and Lee explained one check was issued by BISD to pay for both projects. According to Lee, because the work involved a standalone contract, Walker could charge whatever BISD was willing to pay depending on the scope of the work required and Walker's estimate about what the project would cost. Lee agreed that generally, a BISD document that is signed and stamped indicates the document has been reviewed and approved by BISD. Lee testified that nothing in the Summit delivery receipts show that Kingsley either reviewed or approved the documents Walker submitted for $584,120 of supplies for Regina Howell and South Park. Lee also explained that if Kingsley testified she did review the documents, Lee would not disbelieve her.

On cross-examination, Lee agreed that she knew Walker personally and that Walker had used her as a reference on his bid he submitted for the BISD maintenance contract. Lee also agreed that BISD has discretion to ask that contractors provide invoices showing the cost of the materials used to perform a job, but she then changed her testimony and claimed the discretion to ask for invoices applies only to Walker's Electric's maintenance contract. Lee testified there was no legitimate reason for a contractor to submit a fraudulent document to BISD. Lee explained BISD also conducted an internal investigation into allegations that Walker's Electric

17

was not billing BISD properly, a review that included validating the documentation he sent to BISD regarding Regina Howell and South Park. Lee agreed that she never contacted Summit to confirm that the materials Walker's Electric purchased from Summit tracked the delivery tickets he provided BISD. Lee further testified that in 2011, she was not aware of any mix-up concerning BISD receiving documents that were intended for Walker's Electric's accountant.

Stacy Walker, Walker's ex-wife, also was called by Walker to testify in his defense. Stacy testified that in 2009 she helped Walker with Walker's Electric's paperwork, including sending invoices to his accountant. Stacy testified that after Walker got the South Park and Regina Howell jobs, she accidentally sent documents to BISD that were meant for the accountant. According to Stacy, Walker retrieved the documents she mistakenly sent BISD, documents that included the invoices and checks on the work Walker's Electric performed for South Park and Regina Howell. Stacy explained that voided check numbers 3497 and 3498 from Walker's Electric to Summit "would be the amount that [Walker] would have made for the purchase of the material for the accountant, but not personally." According to Stacy, Walker's Electric had a warehouse with electrical supplies, and check numbers 3497 and 3498 were used to inform their accountant about the cost of the materials for the job even though Walker had purchased the materials elsewhere and had it on hand in a

18

warehouse. Stacy explained she did not know how much of the materials used on those two jobs came from Walker's Electric's warehouse.

On cross-examination, Stacy testified she first saw the documents she sent to BISD by mistake after Walker retrieved the documents from BISD. Stacy testified the Summit delivery receipts for the South Park and Regina Howell jobs were falsified and that voided check numbers 3497 and 3498 were never negotiated. Since Stacy claimed she had mistakenly sent documents including the invoices at issue to BISD, the trial court allowed the State to offer a Factual Basis and Stipulation, a stipulation that contains Walker's signature. The trial court then allowed the Factual Basis and Stipulation to be published to the jury. It states:

> CALVIN GARY WALKER . . . agrees to the truth of all matters set forth in this Factual Basis and Stipulation, . . . . Records from the BISD reflect that on or about August 29, 2009, the defendant submitted an invoice for labor, materials, and rental equipment in the amount of $1,592,839.10 for the electrical wiring of two temporary campuses. On or about September 9, 2009, the BISD issued a check in the amount of $1,592.839.10 for the payment of such materials as well [as] for labor and equipment rental charges. . . . Included in the wholesale invoices was an invoice in the amount of $382,975.32 which had been altered to reflect it was an invoice when in fact the document was a quote and not an actual purchase. The defendant's check payable to that wholesaler in the amount of $382,975.32 was never presented to the wholesaler or negotiated. Records of the BISD also contained similar altered documents purportedly from the same electrical supplier matching invoices submitted by the defendant for materials in other projects. . . . I fully understand the contents of this Factual Basis and Stipulation and agree without reservation that it accurately describes the events and my acts.

19

Finally, Walker called Dr. Carol Thomas to testify in his defense. Thomas testified that from 1996 to 2012, he was the superintendent of BISD. During his tenure, the voters passed a bond for approximately $300 million to build and improve BISD's facilities. Thomas explained that when the bond was being considered, a hurricane damaged some of BISD's campuses and campuses were combined in portable buildings. Walker's Electric held the electrical maintenance contract, and for that reason, BISD chose Walker's Electric to perform the work necessary to connect electricity to the portable buildings. Thomas testified the South Park and Regina Howell projects involved moving the schools to eighty portable buildings until new campuses were completed. BISD accepted Walker's electrical bid for those projects.

According to Thomas, three or four BISD staff members, an architect, and a public adjuster would likely have reviewed Walker's bid before it was approved. Thomas further testified the contract for the projects for the two schools was a stand-alone contract, meaning a contract not covered by Walker's maintenance contract. Thomas testified that people reviewed Walker's work, and Walker did an excellent job in getting the portable buildings ready for the start of school.

Thomas testified that in his opinion, Walker performed the work as promised, and BISD accepted the price Walker charged for the work without ever claiming it did not get its money's worth. Thomas also explained BISD's school board declared

an emergency due to the hurricane damage, and for that reason, he assumed the South Park and Regina Howell projects were done on an emergency basis. Thomas testified that under BISD's policies, a purchase order becomes a contract after BISD accepts a bid. Thomas testified that after Walker's Electric followed BISD's procedures, Kingsley had the authority she needed to sign the check paying Walker's Electric for the work.

On cross-examination, Thomas testified that BISD hired Parsons Corporation as BISD's bond manager to help administer the bond money. Thomas explained that Parsons estimated that it would cost $150,000 per school to prepare a temporary campus for South Park and Regina Howell. Thomas testified he trusted Parsons's competence in managing the bond and he relied on Parson's projections about the costs. Thomas agreed the South Park and Regina Howell projects took around two and a half months to complete and ultimately cost BISD approximately $2.8 million, an amount that Thomas believed was reasonable based on input from his staff and the quotes BISD received. Thomas testified that if the documents his staff relied on were fraudulent, his opinion would change, but that the bond manager and his staff were experts and had assured him the amount BISD paid for the work done at the two schools was reasonable. According to Thomas, in his opinion, Walker treated BISD honestly, but he also agreed that if Walker was in fact dishonest with BISD, his dishonesty would taint the process. Thomas testified that while he could not

recall whether he told FBI agents that Walker was under a cost-plus contract, he assumed that was the case. Thomas also testified that in 2009, he did have concerns about the costs for the South Park and Regina Howell projects. Thomas further testified if BISD had requested additional documentation for an invoice before issuing a check, the contractor should have provided the documentation. On redirect, Thomas explained that the documentation requirement was one of the terms in the maintenance contract.

After hearing the arguments from counsel, the jury found Walker guilty of securing execution of a document by deception, assessed Walker's punishment at ten years of imprisonment, recommended that his punishment be probated, and assessed a $10,000 fine. The jury was not asked to consider whether Walker should be required to repay BISD for the amount it paid Walker due to the fraudulent conduct the jury concluded the State proved in the trial. On October 1, 2019, the trial court conducted a punishment hearing and rendered a judgment finding Walker guilty, but suspended Walker's punishment of ten years of confinement, choosing instead to place Walker on probation for ten years. The trial court also assessed a $10,000 fine. The trial court told Walker that after receiving Walker's post-sentence report, he would conduct a hearing and decide what other terms to impose on Walker as a condition of granting his request for probation.

On October 17, 2019, BISD's Superintendent notified the State that BISD wanted restitution to the fullest extent permitted by law. Walker filed a motion for a new trial, arguing the State had used false and misleading evidence that violated his rights to Due Process. According to Walker, the State repeatedly presented evidence that Walker's contract for the Regina Howell and South Park temporary buildings included a cost-plus term when Walker's bid did not include such a term. On November 5, 2019, Walker filed his Sentencing Memoranda, in which he argued, among other things, that the trial court should not order restitution because the indictment did not allege a loss, the evidence did not establish that BISD suffered a loss, and the jury made no finding as to a restitution amount.

On November 6, 2019, the trial court held a hearing to decide the terms of Walker's probation. During the hearing, Walker's counsel argued the trial court could not order restitution because the court had not orally pronounced that as part of his sentence and because the evidence did not prove a loss. The trial court responded by noting article 42.037 of the Texas Code of Criminal Procedure authorizes trial courts to order restitution as a term of probation, and that the court made it clear that it intended to decide the terms and conditions of Walker's probation after it received the post-sentence report. The trial court noted that no one objected to that plan when the court pronounced Walker's sentence. When the hearing ended, the trial court decided to reset the matter and conduct an evidentiary

23

hearing to determine what amount to assess as restitution and to consider Walker's motion for new trial. The Community Supervision Order the trial court signed following that hearing reflects that Walker will pay restitution as determined by the trial court.

At the January 8, 2020 hearing, the trial court conducted a restitution hearing and heard Walker's motion for new trial. After hearing the evidence, the trial court found BISD's loss due to Walker's fraud was $1,172,656.01. The trial court entered an Order of Restitution and a Judgment Nunc Pro Tunc which again found Walker guilty, but suspended Walker's punishment of ten years of confinement, placed Walker on probation for ten years, and ordered that Walker pay BISD restitution of $1,172,656.01. The trial court also denied Walker's motion for new trial.

ANALYSIS

In issue one, Walker argues section 32.46 of the Texas Penal Code is unconstitutionally vague and violates the Due Process Clause in the Fifth and Fourteenth Amendments. *See* Acts 1997, 75th Leg., R.S., ch.189, § 2, Tex. Gen. Laws 1045, 1046. (amended 2011) (current version at Tex. Penal Code Ann. § 32.46).

"Whether a statute is facially constitutional is a question of law that we review *de novo*." *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013). We presume that a statute is valid and that the Texas Legislature did not act unreasonably or

24

arbitrarily. *Id.* at 14-15. "The burden normally rests upon the person challenging the statute to establish its unconstitutionality." *Id.* at 15. Statutes are not necessarily unconstitutionally vague merely because the words or terms employed in the statute are not specifically defined. *See Engelking v. State*, 750 S.W.2d 213, 215 (Tex. Crim. App. 1988). When a statute does not define the words used therein, we give the words their plain meaning. *See Parker v. State*, 985 S.W.2d 460, 464 (Tex. Crim. App. 1999); *see also* Tex. Gov't Code Ann. § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). A statute will be invalidated if it fails to give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. *See State v. Holcombe*, 187 S.W.3d 496, 499 (Tex. Crim. App. 2006). Because Walker made a facial challenge to the statute, he must prove the statute is unconstitutional in every application and prove the statute could never be constitutionally applied to any defendant under any set of facts or circumstances. *See State v. Rousseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013); *Santikos v. State*, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992). On the other hand, if a reasonable construction renders the statute constitutional, we must uphold the statute. *Tarlton v. State*, 93 S.W.3d 168, 175 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

Section 32.46 provides, in pertinent part, that a person commits the offense of securing execution of a document by deception if, "with intent to defraud or harm

any person, he, by deception . . . causes another to sign or execute any document affecting property or service or the pecuniary interest of any person . . . ." *See* Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 2, Tex. Gen. Laws 1045, 1046. The offense is a felony of the first degree if the value of the property, service, or pecuniary interest is $200,000 or more. *Id.*

The indictment alleges that Walker, with intent to harm or defraud BISD by deception, submitted fraudulent invoices, which in turn caused Kingsley to sign or execute a document that affected the pecuniary interests of BISD. The indictment further alleges that the value of that pecuniary interest is $200,000 or more. A copy of the check signed by Kingsley was attached to Walker's indictment.

Walker asserts that the statute is unconstitutionally vague because it does not define "pecuniary interest." He concludes that absent a statutory definition, it was impossible for the jury to accurately determine whether the value of the pecuniary interest was $200,000 or more. As the term "pecuniary interest" is not defined in section 32.46, we use the plain and ordinary meaning for the term. *See Parker*, 985 S.W.2d at 464; *Goldstein v. State*, 803 S.W.2d 777, 791 (Tex. App.—Dallas 1991, pet. ref'd) (concluding that the pecuniary interest requirement under section 32.46 is met if the complainant had a financial stake in the matter); *see also* Tex. Gov't Code Ann. § 311.011(a). Black's Law Dictionary defines "pecuniary interest" as meaning a direct interest related to money in an action or case. *Pecuniary Interest*, BLACK'S

26

LAW DICTIONARY 1095 (5th ed. 1979). Under section 32.46, the offense is complete when a person causes another to execute a document with the intent to defraud or harm. *See* Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 2, Tex. Gen. Laws 1045, 1046; *Smith v. State*, 681 S.W.2d 71, 75-76 (Tex. App.—Houston [14th Dist.] 1983), *aff'd* 722 S.W.2d 408 (Tex. Crim. App. 1986).

The charge the trial court submitted to the jury is based on Walker's falsification of the documents he presented to BISD to induce BISD to pay Walker's Electric for the work it performed at the two schools. The evidence allowed the jury to reasonably conclude that Walker used the documents that he submitted to BISD with the intent to make BISD pay Walker's Electric money for materials it never actually purchased or received from Summit. It is undisputed that Walker negotiated the check for $1,285,064 that BISD issued Walker's Electric for performing work at Regina Howell and South Park. The "pecuniary interest" required by section 32.46 was met, since the evidence allowed the jury to conclude BISD had a financial stake in paying a reasonable charge in return for the work Walker's Electric performed at the two schools. *See Goldstein*, 803 S.W.2d at 791. We conclude section 32.46 is not unconstitutionally vague and reject Walker's argument claiming that it is. *See Ex parte Lo*, 424 S.W.3d at 15; *Engelking*, 750 S.W.2d at 215. We further conclude section 32.46 provides persons of ordinary intelligence reasonable notice of what

27

conduct the statute prohibits. *See Holcombe*, 187 S.W.3d at 499. Accordingly, we overrule issue one.

In issues two and three, Walker complains the trial court erred by denying his motion to quash, claiming the indictment violates the United States and Texas Constitutions because it does not provide him with notice of the facts the State intended to rely on during his trial to prove he violated the statute. *See* U.S. CONST amends. V, VI, XIV; Tex. Const. art. 1, §§ 10, 19. In reviewing rulings on motions to quash, we apply a *de novo* standard. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007). A defendant has a right to fair notice under the United States and Texas Constitutions. *See* U.S. CONST. amend. VI; Tex. Const. art. I, § 10. To satisfy the requirements of those Constitutions, the defendant's indictment "must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense." *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). Generally, an indictment is sufficient if it tracks the language of the penal statute the defendant is alleged to have violated if that statute also satisfies the constitutional requirements regarding notice. *See State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998).

Here, the indictment tracks the statutory language in section 32.46. *See* Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 2, Tex. Gen. Laws 1045, 1046. Since the statute provides notice to persons of ordinary intelligence of the conduct prohibited

28

by the statute, the indictment provided Walker with sufficient notice to allow him to prepare his defense. *See Lawrence*, 240 S.W.3d at 917. For these same reasons, we conclude the trial court did not err when it denied Walker's motion to quash. We overrule issues two and three.

In issue nine, Walker argues the evidence is insufficient to prove the elements required to establish that he secured the execution of a document by deception, the crime at issue in Walker's indictment. To decide whether there is sufficient evidence to support a finding of guilt, the reviewing court must "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of a crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (other citations omitted). In doing so, we defer to the jury's factual findings and resolve all reasonable inferences in favor of their verdict, as the jury is the sole judge of the credibility of witnesses and the weight to be afforded to the testimony of each. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010). The jury may choose to believe or disbelieve any witness, or any portion of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). We will uphold a jury's verdict "unless a reasonable juror must have had a reasonable doubt as to at least one of the elements

29

of the offense." *Runningwolf v. State*, 360 S.W.3d 490, 494 (Tex. Crim. App. 2012) (citation omitted).

A person commits the offense of securing execution of a document by deception if, "with intent to defraud or harm any person, he, by deception . . . causes another to sign or execute any document affecting property or service or the pecuniary interest of any person . . . ." *See* Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 2, Tex. Gen. Laws 1045, 1046. The offense is a felony of the first degree if the value of the property, service, or pecuniary interest is $200,000 or more. *Id.* The pecuniary interest requirement under section 32.46 is met if the evidence allows a reasonable factfinder to conclude the alleged victim had a financial stake in the matter. *See Goldstein*, 803 S.W.2d at 791.

Kingsley testified she signed check number 557268, the check for $1,285,064, and made it payable to Walker based on the documents Walker submitted to BISD to support the invoices he sent for the materials he used for South Park and Regina Howell. Kingsley explained she relied on several documents that Walker submitted when she decided to pay his two invoices, which included (1) a Summit delivery receipt for $584,120 for the materials Walker purportedly used for South Park, a receipt that is stamped as having been paid; (2) a copy of check number 3498 drawn on Walker's Electric account and payable to Summit for the materials tied to the delivery receipt; (3) a second Summit delivery receipt for $584,120 for the materials

30

Walker's Electric claimed it used on the Regina Howell project, a receipt that is stamped as having been paid; and (4) a copy of check number 3497 drawn on Walker's Electric account and payable to Summit for the materials tied to the receipt. Kingsley testified she would not have signed the check BISD issued and made payable to Walker had she known the Summit delivery receipts and the invoices Walker submitted to BISD were false. Kingsley further testified that Walker never told BISD that Walker's Electric had used its own materials for the projects and providing the Summit delivery receipts was not a proper method to determine the actual cost Walker's Electric incurred for providing its own materials.

Rybacki testified that the Summit delivery receipts referencing Regina Howell and South Park are not genuine Summit documents. Rybacki explained that Summit did not sell Walker's Electric the materials shown in the two delivery receipts that Walker's Electric gave to BISD. Rybacki also explained that while Walker's Electric represented it paid Summit for materials based on the two checks it purportedly issued to Summit, check numbers 3497 and 3498, those two checks were neither negotiated, nor paid. Nwachuku testified that Walker told the FBI that he sent BISD the Summit delivery receipts for South Park and Regina Howell and the checks from Walker's Electric paying for the materials represented in those receipts. Nwachuku also testified FBI agents discovered those checks in Walker's home and found that

31

Walker's Electric voided both checks, which Walker would not have done if the checks had been paid.

Reynolds testified that based on his estimate that the actual cost of materials for South Park and Regina Howell amounted to around $111,000; and therefore, Walker charged BISD more than a reasonable amount for the work Walker's Electric performed. Finally, the jury heard that Walker stipulated that he had presented an altered invoice to BISD in another case that involved another job, the invoice he submitted was a quote and not an actual purchase, and BISD's records contained similar altered documents from the same electrical supplier.

Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority to decide the credibility of witnesses and the weight to give their testimony, we conclude that a reasonable factfinder could have found, beyond a reasonable doubt, that Walker secured the execution of a document by deception, as alleged in the indictment. *See* Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 2, Tex. Gen. Laws 1045, 1046; *Dobbs*, 434 S.W.3d at 170; *Hooper*, 214 S.W.3d at 13. We overrule issue nine.

In issue eight, Walker complains the State presented false and misleading evidence from Kingsley, by improperly suggesting the maintenance contract between Walker's Electric and BISD is the contract that applies to the work Walker's Electric performed at Regina Howell and South Park. In his Motion in Limine,

Walker asked the trial court to prevent the State from suggesting that the maintenance contract covered the projects at issue, because the work Walker's Electric performed was done pursuant to lump-sum agreements and were not jobs that fell under Walker's maintenance contract. According to Walker, Kingsley's false and misleading testimony led the jury to believe he had an obligation to provide receipts to support his invoices on those jobs before BISD was obligated to pay the invoices, and also led the jury to believe the work at the schools was done on a cost-plus basis rather than the price he offered in his proposal. Walker argues that the State's presentation of Kingsley's false and misleading evidence violated his Due Process rights under the Fourteenth Amendment. *See* U.S. CONST amend. XIV.

A conviction obtained with false testimony is a denial of due process. *Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011). A violation of due process occurs when the State elicits false testimony or when the State fails to correct testimony that it knows to be false. *Id.* The prosecutor does not have to know the testimony is false, instead it is sufficient if the prosecutor should have recognized the misleading nature of the testimony. *Id.* A prosecutor's knowing use of false testimony violates due process when there is a "'reasonable likelihood' that the false testimony affected the outcome[,]" or in other words, "the false testimony must have been material." *Id.* (citation omitted). This standard is equivalent to the standard for constitutional error and requires proof, beyond a reasonable doubt, that the alleged

error did not contribute to the verdict. *Id.* at 478 (citing *U.S. v. Bagley*, 473 U.S. 667, 680 n.9 (1985)).

During the trial, defense counsel objected to Kingsley's opinions about the contract Walker was working under at the two schools, and defense counsel fully cross-examined Kingsley about her opinions. The jury is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim Proc. Ann. art. 38.04; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (citation omitted). There is no evidence in the record showing the prosecutor knowingly presented any false testimony or should have recognized the misleading nature of any of the testimony. *See Ex parte Ghahremani*, 332 S.W.3d at 477. Nor is there a "'reasonable likelihood'" that the alleged false testimony was "material" or contributed to the verdict, because the issue was not which contract applied to Walker's work, but whether the jury believed he engaged in deception by submitting fraudulent documents to BISD to obtain payment. *See id.* We conclude no violation of due process occurred. We overrule issue eight.

In issue seven, Walker argues the trial court erred by failing to include the definition of "value" in the jury instruction and by failing to instruct the jury that the terms of the maintenance contract did not apply to Walker's case. When reviewing an alleged charge error, we determine whether error exists in the charge and, if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175

34

S.W.3d 738, 744 (Tex. Crim. App. 2005). If no error occurred, our analysis ends. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (noting that if error occurred, then the court must conduct a harm analysis). If the alleged charge error was the subject of a timely objection in the trial court, then reversal is required if the error is "'calculated to injure the rights of defendant,' which means no more than that there must be *some* harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). In other words, if the alleged error was properly preserved, it will call for reversal as long as the error is not harmless. *Id.* To determine the degree of harm, a reviewing court should consider "the entire jury charge, the state of the evidence, . . . argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).

Abstract or definition paragraphs serve as a kind of glossary to assist the jury in understanding the meaning of terms used in the application paragraphs of the charge. *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012); *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997). Abstractions that are not necessary to an understanding of the terms in the application paragraphs are generally innocuous. *See Plata*, 926 S.W.2d at 302-03. The failure to give an abstract

35

instruction is reversible only when such an instruction is necessary to a correct or complete understanding of a term in the application part of the charge. *Id.* at 302.

The indictment alleges that Walker caused Kingsley to sign or execute a document affecting the pecuniary interest of BISD and that the value of said pecuniary interest was $200,000 or more. The record shows that Walker's counsel requested that the definition of "value" under section 32.02 be included in the jury charge. The trial judge denied the request, explaining that while "pecuniary value" is not defined under the statute, the case law explains that whether pecuniary value results in a loss is a matter for the jury and their collective understanding of the term. In our analysis of issue one we have already explained that since the term "pecuniary interest" is not defined under section 32.46, we must give it its plain and ordinary meaning. Ordinarily, "pecuniary interest" is defined as a direct interest related to money in an action or case. *See Parker*, 985 S.W.2d at 464; *Goldstein*, 803 S.W.2d at 791; *Pecuniary Interest*, BLACK'S LAW DICTIONARY 1095 (5th ed. 1979). We also concluded the record shows the pecuniary interest requirement under section 32.46 was met based on the evidence showing BISD had a financial stake in the matter given the amount it paid Walker's Electric for its work at the schools and the fraudulent documents Walker submitted. *See Goldstein*, 803 S.W.2d at 791; *Pecuniary Interest*, BLACK'S LAW DICTIONARY 1095 (5th ed. 1979). The value of BISD's pecuniary loss from Walker's fraud exceeded the $200,000 alleged in the

indictment. Nothing in the record indicates that the absence of a definition of "value" in the charge prevented the jury from calculating the pecuniary interest BISD lost by virtue of Walker's fraud. *See Crenshaw*, 378 S.W.3d at 466; *Plata*, 926 S.W.2d at 302. We conclude that the trial court's failure to define the term "value" in its charge was harmless.

The record also shows that Walker's counsel requested the trial court to instruct the jury that the maintenance contract referred to during the trial did not apply to the work Walker performed at South Park and Regina Howell since that work was controlled by another standalone contract. "The purpose of the jury charge is to inform the jury of the applicable law and guide them in its application to the case[.]" *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996). A trial court must maintain neutrality and not draw the jury's attention to particular facts to prevent the jury from interpreting a judge's comments as a judicial endorsement or imprimatur. *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019). Trial courts should also "avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence." *Id.*

Walker's request asking the trial court to require the jury to disregard the maintenance contract sought an instruction that would have drawn the jury's attention to specific facts. According to Walker, the heart of his defense was that the

37

South Park and Regina Howell jobs were standalone contracts not covered by the maintenance contract he had with BISD. Since the jury could have interpreted the trial court's endorsement of Walker's defensive theory in evaluating the evidence, we conclude the trial court did not err by denying the instruction because it would have been a prohibited comment on the weight of the evidence. *See id.*

Here, the charge as submitted focused the jury on the facts at issue, whether Walker deceived BISD by submitting fraudulent documents to support BISD's impending decision on whether to pay Walker for the work Walker's Electric performed at the two schools. Thus, the requested instruction would not have informed the jury of the law that applied or guided the jury in applying the law to the facts that were relevant to deciding the disputed issue in the trial. *See Hutch*, 922 S.W.2d at 170. We overrule issue seven.

In issues four, five, and six, Walker complains that the restitution order should be deleted because: (1) the trial court did not order restitution in its oral pronouncement or in its original written judgment; (2) the trial court lacked plenary power to enter the restitution order; and (3) the Fifth Amendment's Double Jeopardy Clause bars the restitution order that was entered ninety-nine days after entry of the oral and written judgment.

There are two scenarios in which it is appropriate for an appellate court to delete a written restitution order: (1) when the trial court lacks statutory authority to

impose the specific restitution order; and (2) when the trial judge is authorized to assess restitution, but the evidence fails to show proximate cause between the defendant's conduct and the victim's injury. *Burt v. State*, 445 S.W.3d 752, 757-58 (Tex. Crim. App. 2014). Article 42.037(e) of the Texas Code of Criminal Procedure provides that the imposition of the order of restitution may not unduly complicate or prolong the sentencing process. Tex. Code Crim. Proc. Ann. art. 42.037(e). The language in article 42.037(e), which includes restitution in the sentencing process, implies that restitution is imposed as part of the original sentence and that the sentence is not complete until restitution is imposed. *See id.*; *Bailey v. State*, 160 S.W.3d 11, 15 (Tex. Crim. App. 2004); *Schultz v. State*, No. 09-09-00161-CR, 2009 WL 5549307, at *2-3 (Tex. App.—Beaumont Jan. 27, 2010, no pet.) (mem. op., not designated for publication). Article 42.01(25) of the Texas Code of Criminal Procedure also provides that if the trial court orders restitution to be paid to the victim, the judgment should include a statement of the amount of restitution the defendant is being ordered to pay. Tex. Code Crim. Proc. Ann. art. 42.01(25).

The record shows that Walker's defense considered that the trial judge might order restitution as a condition of Walker's probation. For example, during Walker's punishment hearing, defense counsel cross-examined Thomas about possible restitution. In closing argument, defense counsel mentioned that the trial judge could order restitution. In October 2019, the trial court pronounced judgment, suspended

Walker's punishment of ten years of confinement, placed Walker on probation for a period of ten years, and indicated the court would conduct another hearing and impose any remaining conditions relevant to Walker's probation after he received Walker's post-sentence report. On November 5, 2019, Walker filed his Sentencing Memoranda, in which he argued the trial court should not order restitution.

On November 6, 2019, the trial court conducted a hearing on Walker's probation conditions and signed a Community Supervision Order that listed Walker's conditions of community supervision, including paying restitution in an amount later determined by the court. The trial court told the parties that article 42.037 of the Texas Code of Criminal Procedure authorized the court to order restitution as a term of probation and explained it was clear to everyone that the probation terms would be determined after the post-sentence report, and there was no objection when the trial court pronounced that it intended to conduct another hearing to decide the amount of restitution. Walker was on notice that the court was making restitution a part of Walker's sentence. *See Burt*, 445 S.W.3d at 759.

On January 8, 2020, the trial court conducted a hearing to decide what amount to award in restitution. Following the January 2020 hearing, the trial court orally pronounced and ordered Walker to pay BISD $1,172,656.01 in restitution and

entered an Order of Restitution and a Judgment Nunc Pro Tunc[2] that same day to include the amount of restitution pronounced in open court.

Under the language used in article 42.037(e), we conclude the trial court did not complete sentencing Walker until the January 8, 2020 hearing when it decided the amount to award as restitution. *See Bailey*, 160 S.W.3d at 15; *Schultz*, 2009 WL 5549307, at *2-3. As such, that was a continuation of Walker's original sentencing hearing that was conducted in October 2019. *See* Tex. Code Crim. Proc. Ann. art. 42.037(e); *Bailey*, 160 S.W.3d at 14-15.[3] In the January 2020 hearing, the trial court pronounced Walker was being ordered to pay BISD $1,172,656.01 in restitution, the final condition imposed on Walker's probation and the term required to make the judgment in Walker's case whole. *See Arguijo v. State*, 738 S.W.2d 367, 369 (Tex. App.—Corpus Christi 1987, no pet.). The trial court also denied Walker's motion for new trial in the January 2020 hearing. The record shows that when the trial court conducted the January 2020 hearing, it still had plenary power over Walker's case.

We conclude the trial court ordered the payment of restitution as required by article 42.037 and imposed Walker's sentence, a sentence that includes the restitution the trial court ordered during the January 2020 hearing. We further

---

[2] Because we have concluded that the sentencing was not completed until the trial court orally announced the amount of the restitution, we need not determine whether the trial court correctly labeled the Judgment entered at the conclusion of the January 2020 hearing as a "nunc pro tunc."

41

conclude Walker's argument claiming the Fifth Amendment's Double Jeopardy Clause bars the order of restitution lacks merit because the trial court was authorized to order restitution under article 42.037. *See Burris v. State*, 172 S.W.3d 75, 77 (Tex. App.—Fort Worth 2005, no pet.) (stating that double jeopardy is not violated when the Code of Criminal Procedure authorizes the sentencing procedure the trial court relied on when sentencing the defendant). For these reasons, we overrule issues four, five, and six. Having overruled Walker's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on June 4, 2021
Opinion Delivered February 9, 2022
Publish

Before Golemon, C.J., Horton and Johnson, JJ.